**LITTLE CAESAR ENTERPRISES, INC., Plaintiff,**

v.

Gary G. SMITH et al., Defendants.

Gary G. SMITH et al., Plaintiffs,

v.

**LITTLE CAESAR ENTERPRISES, INC. et al., Defendants.**

Civ. A. Nos. 93–73354, 93–74041.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 7, 1995.

Stephen D. Susman, Susman Godfrey, Houston, TX, Irwin M. Alterman, Kemp, Klein, Umphrey & Endelman, P.C., Troy, MI, Alan C. Harnisch, Harnisch & Associates, Bingham Farms, MI, for Little Caesar Ent.

Richard A. Lockridge, Heins, Schatz, Robert J. Schmit, Schatz, Paquin, Minneapolis, MN, Charles E. Turnbull, Paul J. O'Reilly, O'Reilly, Rancilio, Nitz, Andrews & Turnbull, P.C., Sterling Heights, MI, for Smith Family Foods.

Richard J. Rodney, Mound, MN, Shawn M. Perry, Perry, Perry & Perry, Minneapolis, MN, for Gary G. Smith.

### *MEMORANDUM OPINION AND ORDER*

GADOLA, District Judge.

These two consolidated cases involve various claims made by three disgruntled franchisees against Little Caesar Enterprises, Inc. ("Little Caesar") and various affiliate companies or subsidiaries. The first action, *Little Caesar Enterprises v. Smith*, No. 93–73354, is a declaratory judgment action by Little Caesar against one of its franchisees, Gary Smith and his company, for a determination of contract rights under their franchise agreement. The center of this dispute and the subject of the three motions being considered, however, is the second suit, *Smith v. Little Caesar Enterprises*, No. 93–74041. In the second suit, the three franchisees have brought a putative class action against Little Caesar for various antitrust violations, conversion, and for breach of their franchise agreements.

Before the court are Little Caesar's two motions for partial summary judgment and the parties' objections to the magistrate judge's report and recommendation on the franchisees' motion for class certification. For the reasons stated below, the court will grant Little Caesar's motions for partial summary judgment, accept in part and reject in part the magistrate judge's report and recommendation, and deny the franchisees' motion for class certification.

## I. Background

The franchisee-plaintiffs in this action are Gary Smith, John Hennessy, and Sharon Fields. Gary Smith owns three Little Caesar stores in Florida, and Linda Smith, Brian Smith, and Smith Family Foods, Inc. are also plaintiffs in this action who are associated with Gary Smith. John Hennessy owns one store in Minneapolis, Minnesota, and Hennessy's company, Pizza Farm, Inc. is also a plaintiff. Sharon Fields owns four stores in Tennessee. Each of Fields' four companies affiliated with these stores are also plaintiffs: LCP of Lenoir City, Inc., LCP of East Maryville, Inc., LCP of Chapman Square, Inc., and LCP of Powell Place, Inc. These franchisee-plaintiffs are seeking damages and other relief on their own behalf and on behalf of a proposed class of Little Caesar franchisees from across the country. As of June 1, 1994, there are a total of 536 franchisees who operate 2,867 restaurants, in addition to about 550 restaurants that opened in K-mart stores and 1,275 company-owned restaurants.

Defendant Little Caesar Enterprises, Inc. is a privately owned franchisor of pizza/fast food restaurants. Defendant Blue Line Distributing, Inc. was a wholly owned subsidiary of Little Caesar until early 1994 when it merged into its parent company. Blue Line has acted as a distributor of supplies to Little Caesar franchisees. Defendant Little Caesar International, Inc. was the passive shareholder of Little Caesar until it merged with that company in early 1994. Defendant Little Caesar National Advertising Program, Inc. ("LCNAP") is a non-profit corporation that pools and collects money from each franchisee pursuant to the franchise agreements and then uses the money to conduct national advertising campaigns. Throughout this opinion, the court will refer to the Little Caesar defendants as "Little Caesar" unless it is necessary to refer separately to one of the defendant companies.

### A. Plaintiffs' Complaint

In their complaint, plaintiffs allege a mixture of antitrust and contract claims. Plaintiffs' antitrust claims are based upon allegations of price-fixing and an illegal tying arrangement. In Count I, plaintiffs seek damages and other relief pursuant to 15 U.S.C.

§ 1 of the Sherman Act. Plaintiffs contend that Little Caesar conspired to fix the price of supplies—food, beverages, equipment, smallwares, graphics, and logoed paper products—sold to its franchisees. Count III is an identical claim under MCLA § 445.772 of Michigan's antitrust statute.

In Count II, plaintiffs allege that Little Caesar engaged in an illegal tying arrangement in violation of the Sherman Act, by forcing franchisees to buy their supplies from Blue Line, rather than independent distributors, in order to remain as viable franchisees. The same claim is expressed in Count IV under section 445.772 of Michigan law.

Plaintiffs' three breach of contract claims are presented in Count V. In their first contract claim, plaintiffs contend that Little Caesar has breached a common provision of the standard franchise agreement that gives franchisees the freedom to set their own retail prices. Plaintiffs argue that Little Caesar conducts national advertising campaigns based upon price which force its franchisees to follow the prices set by Little Caesar in breach of the franchise agreements.

In their second contract claim, plaintiffs allege that Little Caesar has breached the covenant of good faith and fair dealing by failing to pay its franchisees any rebates and discounts that it receives from suppliers. Plaintiffs' final contract claim is that Little Caesar has also breached the franchise agreements by causing defendant LCNAP to implement advertising campaigns that are detrimental to franchisees and to misuse pooled franchisee funds for improper purposes. A similar claim is stated in Count VI, where plaintiffs allege conversion by Little Caesar and LCNAP for taking franchisee advertising funds and using them for purposes other than advertising that benefits franchisees.

### B. Tying Arrangement

The claim upon which plaintiffs rely most heavily, as expressed in Count II, is that Little Caesar has conducted a systematic campaign, pursuant to a "master plan," to replace independent distributors of food and other supplies to franchisees with a Little

Caesar subsidiary, Blue Line, now merged into Little Caesar. Plaintiffs contend that Little Caesar has forced all franchisees to purchase food and other supplies from itself, and that Little Caesar's conduct constitutes an illegal tying arrangement under the federal and state antitrust laws.

Originally, Blue Line was only able to service franchisees located in the Midwest. Over the past twelve years, however, Blue Line/Little Caesar has expanded and now has sixteen distribution centers all over the country capable of servicing all franchisees except for certain remote areas of Idaho and North Dakota. Plaintiffs contend that Little Caesar and Blue Line had a master plan to force franchisees to cease buying their supplies from independent distributors and have them buy exclusively from Blue Line instead. As part of this scheme, plaintiffs allege that Little Caesar used its market power, selective rejection of requests for alternate suppliers, and the attractiveness of one-stop shopping to franchisees in order to take control of the distribution of supplies to its franchisees.

The essence of the illegal tying claim is that in order to own a Little Caesar franchise (the tying product), franchisees are forced to buy their food and other supplies (the tied product) from Little Caesar. The price-fixing claim centers around plaintiffs' claim that Little Caesar has conspired with others, including the independent distributors, to fix the price of supplies charged to franchisees.

Under the franchise agreements, franchisees are free to buy food and other supplies from approved, independent distributors. However, franchisees are only allowed to buy a secret spice mix and special Pan!Pan! dough mix from Little Caesar and no other source. Plaintiffs do not challenge Little Caesar's right to control the distribution of these two special proprietary items and they are not part of this lawsuit. Plaintiffs are, however, challenging the control of all other food and supplies. Furthermore, starting in mid–1990, all newly signed franchisees, through a provision in their franchise agreements, were not allowed to request alternate distributors of paper products that have the Little Caesar logo on them. Because Little Caesar/Blue Line is the exclusive distributor of "logoed paper products," plaintiffs contend that franchisees are thus forced to buy such items from Little Caesar. However, plaintiffs' tying claim is not limited to logoed paper products or agreements signed after mid–1990. Instead, plaintiffs' claim encompasses all franchisees and all supplies necessary to run a franchise except for the special proprietary items mentioned above.

This lawsuit appears to have arisen from an incident in 1992, when plaintiff Smith sought to have Ameriserv, an independent distributor of fast food supplies, approved by Little Caesar as a distributor to its franchisees. The approval process is supposed to be a determination of whether the distributor can provide supplies that meet specifications set by Little Caesar. Ultimately, Little Caesar rejected Ameriserv's application. It appears that the rejection of Ameriserv led to the filing of this lawsuit. Since the inception of this action, however, Little Caesar has approved franchisee requests for three independent distributors—Gordons, PYA Monarch, and Schloss & Kahn—to be authorized to sell supplies to franchisees. In addition, Little Caesar contends that the rejection of Ameriserv was an isolated occurrence and that it has received only six requests over the decade before this lawsuit for approval of new independent distributors. Two of these requests were rejected and four were withdrawn.

## C. Breach of Contract

The second main claim of plaintiffs, as expressed in a portion of Count V, is that Little Caesar has breached the franchise agreements that allow franchisees to set their own retail prices. Plaintiffs contend that Little Caesar has used national advertising campaigns that mention specific prices to force its franchisees to match those prices. Because the franchisees are forced to match the nationally advertised prices as a result of consumer expectations, plaintiffs contend that Little Caesar has breached the franchise agreement provision allowing individual franchisees to set their own retail prices. Little Caesar points out, however, that each of the national ads contain the following disclaimer: "Limited time offer at participating stores. Prices may vary." In addition, Little Caesar

relies on the fact that all three of the plaintiff-franchisees admit that on occasion they do not follow the nationally advertised prices, and instead, set higher prices or encourage alternate special deals that are more profitable.

The third major area of the lawsuit, expressed in portions of Count V and VI, concerns the handling of franchisee money given to LCNAP. LCNAP is a non-profit company that collects and pools money from all of the franchisees and uses it to advertise Little Caesar pizza. In Count VI, plaintiffs contend that LCNAP and Little Caesar have converted franchisee money in the LCNAP advertising fund for purposes beneficial to Little Caesar only and not the franchisees. In addition, plaintiffs allege that Little Caesar and LCNAP have breached the franchise agreements by failing to use the LCNAP funds for the benefit of the franchisees. An example of the alleged breach includes the use of $670,000 of LCNAP funds as sponsorship money for the Detroit Drive, an arena football team owned by Mike Illitch, Little Caesar's primary owner. As another example, $200,000 in LCNAP funds were allegedly used to pay a former Little Caesar executive to sponsor his racing boat which appeared in nationally televised racing competitions.

In this memorandum opinion, the court will address two motions for partial summary judgment filed by Little Caesar in January and February of 1995. In addition, the court will consider the parties objections to the magistrate judge's March 31, 1995 report and recommendation regarding plaintiffs' motion for class certification. In its first Rule 56(c) motion, Little Caesar is seeking a finding limiting the applicability of a 1989 licensing agreement between Little Caesar and Blue Line to certain specified logoed products. This issue is important as it impacts upon contentions made by plaintiffs in their class certification motion. Little Caesar's second motion for partial summary judgment seeks judgment as to many, but not all, of plaintiffs' individual claims presented in Counts I–V.

In his March 31, 1995 report, Magistrate Judge Stephen Pepe recommended that the court certify sixteen regional classes as to plaintiffs' tying claim and a national class on the breach of contract claims. Both sides have filed objections to this report. In their June 1994 motion for class certification, plaintiffs did not seek class certification as to all of their claims. Instead, plaintiffs are only seeking Rule 23(b)(3) certification of Count II, the tying arrangement. In addition, plaintiffs are seeking Rule 23(b)(2) certification for injunctive and declaratory relief, of Count II, the breach of contract claims based upon the use of LCNAP funds and the national advertising campaigns as presented in Count V, and the conversion claim in Count VI.

## II. Standard of Review

### A. Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citation omitted) (quoting Black's Law Dictionary 881 (6th ed. 1979)). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of

material fact. Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

■ To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted). *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd*, 929 F.2d 701, 1991 WL 49687 (6th Cir.1991). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings. *Id.*

### B. Review of a Magistrate Judge's Report and Recommendation

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, 28 U.S.C. § 636(b)(1)(B), and LR 72.1(d)(2) (E.D.Mich. Jan. 1, 1992), the court will review the magistrate judge's March 31, 1995 report and recommendation as well as the objections filed by the parties. Because of the nature of plaintiffs' motion for class certification, the court will conduct a *de novo* review of the report and recommendation.

### III. Little Caesar's First Motion for Partial Summary Judgment

■ In its first motion for partial summary judgment, Little Caesar is asking the court to determine the scope of a 1989 licensing agreement between Little Caesar and its former subsidiary, Blue Line. This issue is important because plaintiffs have relied heavily on this document as a basis for their request for class certification. As a result, should the court construe the licensing agreement more narrowly, it may have a tangential effect upon plaintiffs' certification motion.

The June 1989 agreement gave Blue Line an exclusive license to distribute logoed products to franchisees. Little Caesar contends that this agreement only covers those items that bear a Little Caesar's registered mark, and thus is asking this court to find that the 1989 agreement only applies to items given to a retail customer that bear a registered mark, such as logo paper items and individual packages of condiments marked with logos. This only includes only such items as bags, cups, napkins, and logo condiments used by retail customers, such as individual salad dressings. Plaintiffs, however, seek to define "logo products" much more broadly.

In exchange for the license, Blue Line agreed to pay Little Caesar 1% of its gross sales of these items. After the agreement was executed in May 1989, all third-party distributors and suppliers were informed by memo that Blue Line would be the exclusive supplier of the logo items. The memos listed only the items discussed above. In the agreement itself, the following language defines the covered logo items:

> WHEREAS Little Caesar desires to grant an exclusive license to Blue Line to contract with third parties for the manufacture and production of certain supplies and

paper products which utilize the Proprietary Marks, including without limitation, carry out bags, wrappers, dishes, napkins, cups and boxes ("Logo Products").

Little Caesar has presented evidence demonstrating that the logo items amount to only a small percentage of the purchases made by franchisees. Little Caesar has also shown that it was the consistent course of conduct of itself and Blue Line to have the agreement only apply to those few logoed items going to retail customers. Under the agreement, Blue Line is required to submit monthly reports to Little Caesar detailing the amount of sales of the logoed products so that the 1% royalty can be determined. Little Caesar has presented numerous examples of these monthly reports that confirm that only the sales of paper products and individual salad dressings bearing a registered mark are covered by the licensing agreement. In the 1989 memos sent to independent distributors and suppliers about the new licensing arrangement, Little Caesar told them that only the following items were covered: cups, lids, straws, bags, salad containers, napkins, cup carriers, dressings, and convenience packs. In essence, Little Caesar is asking the court to rule that the licensing agreement only covers items given out to customers with the Little Caesar logo on them.

Plaintiffs argue that the licensing agreement covers virtually all supplies delivered in bulk to franchisees by Blue Line that have a Little Caesar logo somewhere on the packaging. Under this interpretation, the licensing agreement would apply to most supplies bought by franchisees. This is because many of the supplies purchased by franchisees are provided according to Little Caesar specifications and thus have Little Caesar logo on the bulk packaging even though the supplies were sold by an independent distributor.

If plaintiffs' interpretation is correct, then franchisees would be required to purchase much of their supplies through Blue Line, thereby seemingly establishing a tying arrangement on the basis of the national 1989 agreement that appears to be applicable to all franchisees. This is important because plaintiffs' interpretation would strengthen their argument for class certification.

In support of their interpretation of the licensing agreement, plaintiffs point to the language of the agreement that says that the license applies to "certain supplies ... including without limitation ..." Plaintiffs contend that the without limitation language means that the agreement could apply to any supplies named by Little Caesar. In addition, plaintiffs cite other documents in which Little Caesar lists specific logoed products as being covered by the licensing agreement, but also indicates that the agreement's coverage is not limited to the list.

In response, Little Caesar argues that the "without limitation" language was included so that new products given out to retail customers that bear the company's registered mark would be covered by the agreement. This was the case when certain franchisees started to issue promotional plastic cups to its customers that had the Little Caesar logo on them, and Little Caesar informed the franchisees and their suppliers that Blue Line had the exclusive right to distribute such logoed products. In addition, Little Caesar has indicated that signs, uniforms, and logoed promotional items are restricted in their distribution, but that this is not a result of the 1989 licensing agreement.

Plaintiffs also rely upon various statements by Little Caesar officials concerning logoed products. However, some of the statements cited by plaintiffs actually support Little Caesar's motion. For example, in a 1992 memo from David Deal, the head of Blue Line, to Mike Illitch, Little Caesar's primary owner, about the prospect of a new independent distributor that would compete with Blue Line, Deal said that franchisees would be less likely to contract with the new distributors because of the necessity of taking two deliveries, one from Blue Line for logoed products and one from the distributor for all other products. In addition, the president of Ameriserv, William Burgess, testified that his company had to have access to the logoed products as defined by Little Caesar in order to compete. Although these facts support plaintiffs' contention that Little Caesar was trying to control the supplies going to its franchisees, they also support Little Caesar's position in its motion for partial summary

judgment on the issue of the scope of the term "logoed products."

Finally, plaintiffs oppose Little Caesar's motion because they claim that Little Caesar is trying to inject merit issues into the class certification determination through this motion for partial summary judgment. Additionally, plaintiffs argue that the motion is improper because it seeks to determine a single, non-dispositive issue of fact. However, in *France Stone Co., Inc. v. Charter Township of Monroe*, 790 F.Supp. 707, 710 (E.D.Mich.1992), this court addressed a similarly narrow issue of particular concern to the parties that significantly advanced the progress of that litigation. In the same way, the court finds that the scope of the 1989 licensing agreement in this case is of sufficient import so as to justify an examination of Little Caesar's motion. Furthermore, the court also finds that this motion does not inject merit issues into the class certification motion, but instead clarifies an issue that the court finds to be clear from the facts and evidence presented by both sides.

In this vein, the court concludes that the 1989 licensing agreement between Little Caesar and Blue Line only applies to items given to a retail customer that bear a Little Caesar's registered mark, such as logo paper items and individual packages of logo condiments. This is the only rational interpretation of the licensing agreement given its explicit language and the long and established course of conduct demonstrated between Little Caesar and Blue Line. It also is consistent with the way Little Caesar has explained the agreement to independent distributors and suppliers. In this instance, plaintiffs have attempted to stretch the language of the agreement to apply to virtually all supplies purchased by franchisees. Such an interpretation contradicts the language of the agreement, the way the agreement has been carried out, and common sense. As a result, the court concludes that there is no genuine issue of material fact as to the interpretation of the 1989 agreement, and it will grant Little Caesar's motion for summary judgment.

## IV. Little Caesar's Second Motion to Dismiss and/or for Partial Summary Judgment

In this motion, Little Caesar is seeking summary judgment and/or dismissal of the claims presented in portions of Counts I–V.

### A. Count I—Price-fixing

In Count I, plaintiffs allege that Little Caesar conspired with independent distributors to fix prices of the supplies sold to franchisees. From 1982 until January 1988, Blue Line told independent distributors what prices to charge Little Caesar restaurants for supplies, which generally was a national price. From January 1988 until May 1988, Little Caesar established "regional pricing" whereby independent distributors were directed to charge the same prices as those charged by a Blue Line warehouse in the same or nearby region. In this way, Little Caesar argues, prices would more accurately reflect the actual freight costs of suppliers to the various regional distributors. From May 1988 until Blue Line opened a warehouse in a particular region, Blue Line suggested maximum percentage markup ranges for various categories of supplies.

Little Caesar claims it began suggesting prices to independent distributors in 1982 when it was discovered that the prices charged to franchisees by distributors were too *high*. By suggesting maximum prices, Little Caesar allegedly hoped to protect its franchisees from unscrupulous distributors trying to gouge the unwary.

In responding to the price-fixing claim, Little Caesar has focused upon the particular distributor that serviced each of the plaintiffs. Plaintiff Smith's franchise was serviced by Continental Meats, an independent distributor, until January 1986, when Blue Line began selling supplies to Smith. Plaintiff Fields' distributor was PYA Monarch. In February 1989, Blue Line opened a warehouse that serviced Fields' region. When PYA Monarch withdrew from the market in July 1989, Fields switched to Blue Line. Plaintiff Hennessy has at all times purchased his supplies from Blue Line.

## 1. Plaintiffs Smith and Hennessy

■ Little Caesar contends that plaintiffs Smith and Hennessy do not have a price-fixing claim because the alleged conspiracy was designed to fix the maximum prices of independent third-party distributors and not Blue Line who was the distributor serving Smith and Hennessy. Thus, Little Caesar contends that the prices charged Smith and Hennessy were not fixed.

In response, plaintiffs Smith and Hennessy contend that they have standing to sue Little Caesar and Blue Line for the alleged price-fixing because Blue Line was able to set its prices at anti-competitive levels because the prices of competing distributors had been fixed at similarly high levels in accord with the conspiracy. In addition, plaintiffs contend that any co-conspirator is jointly and severally liable to a plaintiff even if that plaintiff did not deal directly with them. *See Ambook Enters., Inc. v. Time, Inc.*, 612 F.2d 604, 620 (2d Cir.1979), *cert. denied*, 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980).

Little Caesar contends, however, that no evidence has been offered to show that Blue Line's prices were set by agreement with the independent distributors. Since plaintiffs Smith and Hennessy purchased only from Blue Line, they have not been harmed by the higher prices allegedly fixed by the independent distributors.

The court will grant Little Caesar's motion for summary judgment against plaintiffs Smith and Hennessy as to the price-fixing claim. Plaintiffs Smith and Hennessy have not produced *any* evidence in response to the Rule 56 motion to show that they have suffered any harm as a result of the alleged conspiracy. They have come forward with no evidence showing that the prices they paid for supplies were even affected by Little Caesar's conduct. In their response brief, plaintiffs merely allege that Blue Line's prices were anti-competitive, but provide no evidence of any kind to back this conclusion. During oral argument, plaintiffs conceded that the price-fixing claim was not of great import to them and was merely "background" information for their tying claim. In this context, and because plaintiffs Smith and Hennessy have failed to raise a genuine issue of material doubt in response to Little Caesar's motion, summary judgment is appropriate on Count I as against Smith and Hennessy.

## 2. Plaintiff Fields

■ Little Caesar contends that it deserves summary judgment as to plaintiff Fields because this plaintiff has not suffered any antitrust injury from the vertical maximum suggested markup policy—the alleged price fixing—and because her claims are barred by the statute of limitations.

As to antitrust injury in particular, from May 1988 until February 1989, the prices as to Fields were maximum prices only. In memos to independent distributors, Little Caesar told the distributors that the suggested prices were "maximum ranges only! Lower markup ranges would certainly be welcomed!" In fact, after the suggested prices went into effect, PYA Monarch told its customers, including Fields that the "result of this change will be savings to you." Under these circumstances, Little Caesar contends that Fields suffered no antitrust injury when her distributor was prevented from charging her higher prices.

Even if Fields suffered antitrust injury, Little Caesar contends that her claim is barred by the four year statute of limitations set in 15 U.S.C. § 15b, unless the price-fixing policy was fraudulently concealed.

Fields filed her claim in September 1993, more than four years after her distributor withdrew from the market. In its brief, Little Caesar details how the pricing policies complained of were fully explained and revealed to its franchisees, including Fields. In particular, Fields learned from her sister in early 1989 from PYA Monarch that it would like to charge lower prices, but was prevented from doing so by Little Caesar's pricing policies.

■ In order to establish fraudulent concealment in order to defeat the bar posed by a statute of limitations, plaintiff Fields must show the following:

(1) Wrongful affirmative concealment;

(2) Failure to discover within the limitations period; and

(3) Due diligence until discovery.

*Pinney Dock & Trans. Co. v. Penn Central Corp.,* 838 F.2d 1445, 1465 (6th Cir.1988), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). Under the circumstances presented here, Little Caesar contends that plaintiff Fields cannot establish fraudulent concealment of the alleged price-fixing conspiracy. In response to the motion as to this claim, plaintiffs have not presented a spirited or meaningful defense, and it appears that plaintiffs are concentrating on their tying claim to the exclusion of the price-fixing claim, admitting during oral argument the price-fixing claim was not "central" to their case.

Under these circumstances, the court will grant Little Caesar's motion for summary judgment against plaintiff Fields as to Count I. It is apparent that Fields was made fully aware of the pricing policy instituted as to her distributor at least as early as the beginning of 1989. As a result, her September 1993 complaint alleging price-fixing was filed beyond the period allowed by the statute of limitations. In addition, Fields has failed to present any evidence showing that she suffered any antitrust injury as a result of the alleged conspiracy. Thus, plaintiff Fields has failed to present sufficient evidence to defeat Little Caesar's motion concerning the price-fixing claim.

### B. Count II—Tying Arrangement

■ As discussed earlier, plaintiffs contend that Little Caesar has forced them to buy their food and other supplies from Blue Line in order to continue in their business as franchisees. Plaintiffs contend that this conduct is an illegal tying arrangement and a violation of the Sherman Act, 15 U.S.C. § 1. The essential elements of a tying claim under the Sherman Act are as follows:

1. there must be a tying arrangement between two distinct products;

2. the seller must have sufficient economic power in the tying market to restrain appreciably competition in the tied product market; and

3. the amount of commerce affected must not be insubstantial.

*Virtual Maintenance, Inc. v. Prime Computer Inc.,* 11 F.3d 660, 664 n. 6 (6th Cir.1993), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 2700, 129 L.Ed.2d 829 (1994); *see Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 613–14, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953). In addition, "coercion is an implicit requirement for an unlawful tie-in agreement." Earl W. Kintner & Joseph P. Bauer, 2 *Federal Antitrust Law* § 10.59, at 250 (1980, Supp.1995). In this instance, plaintiffs claim that in order to have a Little Caesar franchise (the tying product), franchisees are forced to buy their food and supplies (the tied product) from Little Caesar/Blue Line.

### 1. All Plaintiffs

Little Caesar is seeking summary judgment on the tying claims based upon its contention that no tying arrangement existed, and that the existence of "forcing" or actual coercion of the individual franchisees is a required element of the claim. Little Caesar admits that this portion of its motion does not apply to any of the claims asserted by plaintiff Smith after his request to approve Ameriserv as an independent distributor was made in April 1992. Little Caesar concedes that plaintiff Smith has a triable issue of fact as to whether the denial of the request to approve Ameriserv was reasonable and proper. In addition, Little Caesar indicates that its motion assumes it has market power and that the franchise and its supplies are distinct products. Little Caesar indicates that future motions will address these issues.

The basis of this portion of Little Caesar's motion is its contention that the plaintiffs, other than Smith, cannot show that they have been *forced* to purchase the tied product (food and other supplies) from Little Caesar/Blue Line. Little Caesar argues that in order to establish a tying claim plaintiffs must point to a particular contractual provision that binds their ability to choose independent distributors. Alternatively, Little Caesar claims that plaintiffs could establish a tying claim by showing that they objected in some way to Little Caesar/Blue Line as their

distributor or that plaintiffs knew that a request for approval of an alternate distributor was futile. In essence, Little Caesar contends that plaintiffs must show some sort of forcing or coercion as an essential element of a tying arrangement.

In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984), the Supreme Court stated that

> [o]ur cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such *"forcing"* is present, competition on the merits for the tied item is restrained and the Sherman Act is violated.

*Id.* (emphasis added). Under the Supreme Court's decision and subsequent lower court interpretation, antitrust plaintiffs must demonstrate that they have been forced to purchase the tied product. As one leading commentator indicated as early as 1980 and even before *Jefferson Parish*, "[a] growing trend is to require a strict individual demonstration of coercion." Bauer & Kintner, *supra*, at 250. Such forcing can be demonstrated by an explicit contractual provision or provisions, individual evidence of coercion, or an admission by a defendant. The Sixth Circuit cases relied upon by plaintiffs show support, rather than opposition, to this method of proof in tying cases. *See Virtual Maintenance Inc. v. Prime Computer, Inc.*, 957 F.2d 1318, 1324 (6th Cir.1992) (extreme price differential meant that all rational buyers were forced to accept tied product), *vacated on other grounds*, —— U.S. ——, 113 S.Ct. 314, 121 L.Ed.2d 235 (1992); *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1131 (6th Cir.1981) (defendant admitted to tying arrangement based upon provisions of lease and sub-lease).

As Little Caesar points out, each of the franchise agreements at issue specifically allows the plaintiffs the ability to seek approval of independent distributors to provide them with supplies. In *Midwestern Waffles, Inc.*

*v. Waffle House, Inc.*, 734 F.2d 705, 712 (11th Cir.1984), the court stated that "[a]n approved source requirement is not, alone, illegal. Only if a franchisee is coerced into purchasing products from a company in which the franchisor has a financial interest does an illegal tie exist." The question then is whether Little Caesar unreasonably refused to grant approval of an independent distributor or whether plaintiffs were aware that the approval process was futile. In this case, plaintiffs concede that they do not claim that they knew that the approval process was futile.

Plaintiff Smith claims that a tie-in has existed since 1982, and he claims damages since September 1989, four years prior to the filing of this lawsuit and within the statute of limitations. However, Smith only sought approval of an independent distributor as an alternative to Blue Line in April or May of 1992. At that time, Smith sought Little Caesar's approval of Ameriserv as a distributor. Under these circumstances, Little Caesar is seeking summary judgment against Smith as to any damages pursuant to a tying claim suffered before he sought approval of the alternate distributor. Little Caesar contends that it was only when Smith objected to Blue Line and sought Ameriserv that it became clear that he was being forced to buy the tied product.

Little Caesar's position is strengthened by the fact that in 1988 Smith was part of a large group of franchisees who considered purchasing supplies from a competitor of Blue Line. However, after a series of meetings, Smith's concerns were addressed and he decided to stay with Blue Line. On this basis, Little Caesar contends that Smith cannot claim that he was forced to do anything since he agreed to stay with Blue Line of his own free will. Thus, Little Caesar alleges that Smith experienced none of the forcing symptomatic of a tying arrangement until April 1992 when he sought approval of an independent distributor.

Little Caesar applies similar logic to the claims of plaintiffs Fields and Hennessy. In Hennessy's case, he has never sought an alternate distributor. Fields also has never sought approval of another distributor and

was only aware of the single rejection of Ameriserv as an alternative distributor for Smith. Under these facts, Little Caesar argues that none of the plaintiffs, except for Smith after April 1992, has objected to the status of Blue Line as the sole distributor of supplies and can thus demonstrate that it was forced to purchase supplies from Little Caesar/Blue Line.

Little Caesar cites *Klo–Zik Co. v. General Motors Corp.*, 677 F.Supp. 499, 506 (E.D.Tex. 1987) and *Dubuque Communications Corp. v. American Broadcasting Companies*, 432 F.Supp. 543, 546 (N.D.Ill.1977), *aff'd,* 547 F.2d 1170 (7th Cir.1976), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977) for the proposition that in order to prove a tying claim, plaintiffs must produce "evidence that the undesired condition was imposed over plaintiff's objection, or at the explicit refusal of the defendant to do otherwise. When a condition is accepted without objection, the element of coercion becomes totally speculative." *Dubuque,* 432 F.Supp. at 546. Similarly, in *Klo–Zik,* the court stated that "If two products are sold together, there must be evidence that the buyer objected to the package, that the buyer was only interested in one of the two products or that the tied product was forced upon him." *Klo–Zik,* 677 F.Supp. at 506. Where the tying arrangement is admitted or where the arrangement is imposed as part of a contract, there is no further need to demonstrate the forcing element. Because of the very nature of a binding contract, coercion and forcing can be implied since the victim of the tying arrangement has no other choice but to comply with the arrangement or face litigation to enforce the contract. "All courts agree, [however], that absent contractual tie-in provisions, actual coercion must be demonstrated." Bauer & Kintner, *supra,* at 252.

Of the three plaintiffs currently before the court, only Smith has signed a franchise agreement that arguably contains an explicit tying arrangement. As a result, since no express contractual tie is present in this case as to plaintiffs Fields and Hennessy and because they have not sought approval or otherwise objected to Blue Line as their distributor, Little Caesar contends that summary judgment is proper.

■ As to plaintiff Smith, however, one of his three franchise agreements was signed after mid–1990, and thus includes a limitation on the approval of independent distributors as to the supply of logoed products. As a result, Smith may have a tying claim for the purposes of this motion based upon an express contractual tie. Thus, there is no further need to show forcing or some other coercive element in order to establish his claim. Consequently, plaintiff Smith could have a tying claim as it relates to his one franchise governed by the mid–1990 agreement.

■ As to plaintiffs Hennessy and Fields, however, the court will grant Little Caesar's motion for summary judgment on the tying claim as to these two plaintiffs. Within the applicable time period, neither one requested approval of an independent distributor or were subject to an explicit contractual tie-in as part of the franchise agreements by which they were bound. Furthermore, these plaintiffs cannot show that had they made a request for an alternate distributor, it would have been futile. As a result, there is no indication that either Fields or Hennessy was forced to continue purchasing supplies through Little Caesar/Blue Line. Any claim by plaintiff Fields based upon PYA Monarch's exit from the market is addressed in the section below.

## 2. Plaintiff Fields

■ Little Caesar contends that any tying claim relating to the independent distributor PYA Monarch, which serviced plaintiff Fields' franchises, is barred by the statute of limitations.

Prior to February 1989, plaintiff Fields' franchises purchased their supplies from an independent, third-party distributor, PYA Monarch. In February 1989, Blue Line opened a warehouse in Atlanta that serviced the region in which Fields' franchise is located. Following Blue Line's entry into the market, Fields continued to purchase from PYA Monarch until it withdrew from the market in July 1989 and stopped selling sup-

plies to Fields' franchises. Fields then began purchasing her supplies from Blue Line.

Little Caesar contends that Fields may claim that her purchases from Blue Line, beginning when PYA Monarch withdrew from the market, were a tie-in because of actions that Little Caesar allegedly took against PYA Monarch. Little Caesar argues that assuming for the purposes of this motion that such a tie-in resulted, any such claim by Fields would be barred by the four year antitrust statute of limitations. *See* 15 U.S.C. § 15b. As indicated earlier, this case was filed in September 1993, so the unlawful conduct must have occurred after September 1989, in order for Fields' claim not to be barred.

Little Caesar argues that since PYA Monarch withdrew from the market more than four years before this lawsuit commenced, the claim is barred unless the "continuing violation" doctrine applies. According to the Sixth Circuit, a

> "continuing [antitrust] violation [is] one in which the plaintiff's interests are repeatedly invaded." This circuit has refined the *Zenith* standard to the point that it now can be expressed as two discrete rules. First, "[w]hen a continuing antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants." Second, "in the context of a continuing conspiracy, the statute of limitations runs from the commission of the act that causes the plaintiff's damage." Thus, "even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." For statute of limitations purposes, therefore, the focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts.

*Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir.1990) (citations omitted). In *Peck*, even though the plaintiff had suffered some injury within the last four years, the court dismissed his claim under the statute of limitations because there was no new overt act. *See Fontana Aviation, Inc. v. Baldinelli*, 575 F.2d 1194 (6th Cir.1978) (claim accrued when company pulled out of the market), *cert. denied*, 439 U.S. 911, 99 S.Ct. 281, 58 L.Ed.2d 257 (1978); *Barnosky Oils, Inc. v. Union Oil Co.*, 665 F.2d 74, 82 (6th Cir. 1981) (claim accrued when boycott first occurred, not while it continued to be in force). Little Caesar contends that because no overt act has been directed at plaintiff Fields in the last four years, any claim she may have based upon the pullout of PYA Monarch from the market is barred by the statute of limitations.

In response, plaintiffs allege that Little Caesar fraudulently concealed its conduct against Fields and that its conduct was not limited to the elimination of PYA Monarch from the market. As to fraudulent concealment, plaintiffs rely upon the 1989 licensing agreement which they claim was kept hidden from them, such that Fields could not have filed her claim due to this concealment.

Plaintiffs also claim that Little Caesar committed numerous overt acts, other than the elimination of PYA Monarch from the market, after September 1989 as part of its effort to control the distribution of supplies. Plaintiffs contend that Little Caesar refused to approve other distributors in other parts of the country, used the licensing agreement to foreclose competition, and sent letters to franchisees, suppliers, and distributors enforcing the tying agreement.

The court finds, however, that any tying claim by plaintiff Fields based upon the elimination of PYA Monarch from the market is barred by the statute of limitations. Conduct by Little Caesar directed towards eliminating PYA Monarch from the relevant market could serve as the basis of a tying claim, but this conduct occurred more than four years before this suit was filed. None of the new overt acts complained of by plaintiffs in the past four years appear to relate to plaintiff Fields and her franchise. Plaintiffs refer generally to many incidents cited in their various briefs, but fail to point out specific incidents applicable to Fields. In addition, there have been so few refusals to approve independent distributors, and Fields was only aware of the refusal relating to Ameriserv, that plaintiffs cannot argue that the process was made futile in the past four

years. Furthermore, under Fields' franchise agreement she could ask for approval of a distributor of any products and was not limited as to logoed products. Also, Fields never asked Little Caesar to approve a new distributor in the past four years. Any refusal of such a request would have been a new overt act by Little Caesar. However, since Fields made no such request, her tying claim is barred.

## C. Counts III–IV—State Antitrust Law

■ Little Caesar is also seeking summary judgment on the state antitrust claims for the same reasons advanced in support of its motion for summary judgment on the federal claims. Since Michigan antitrust law is identical to federal law and follows the federal precedents, the decision as to Counts I and II will govern the success of Counts III and IV. Pursuant to MCLA § 445.784(2), in construing Michigan antitrust law, "the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes." As a result, there is no practical difference between the federal and state claims and the court reaches the same conclusions as to Counts III and IV as it did with respect to Counts I and II.

## D. Count V—Breach of Contract and National Price Advertising

■ Each franchise agreement provides that "[t]he final decision as to all matters of pricing ... shall be made solely by [the] Franchise owner." Plaintiffs claim that Little Caesar breached this provision by conducting a national advertising campaign based upon "price point advertising." The campaigns consist of a series of short run promotions of particular items that are pervasively advertised nationally at a specific price in the ads. In its motion, Little Caesar contends that it has not breached the pricing provision of the franchise agreements, and that plaintiffs have always had the freedom to set their own retail prices.

Little Caesar has presented evidence showing that many franchisees do not sell the promoted products at the nationally advertised price, and that it in no way punishes franchisees who do not follow the advertised prices. In fact, each of the three plaintiffs in this case have admitted charging prices that are higher than those that are nationally advertised, or that they have deviated from the national promotions in some other manner. In addition, each of the national ads contain the following disclaimer: "Limited time offer at participating stores. Prices may vary."

In response to this portion of Little Caesar's motion, plaintiffs contend that Little Caesar required its franchisees to abide by its pricing decisions by first creating tremendous customer expectation through pervasive price advertising, and second, by then intimidating franchisees willing to upset customer expectations and deviate from the national price.

Since 1989, Little Caesar has advertised based upon price through LCNAP. Franchisees are required to contribute up to 4% of their gross revenue to LCNAP for advertising purposes. The advertising monies amount to $50–$60,000,000 annually and are managed by Little Caesar employees.

Plaintiffs point to a 1988 letter sent to Little Caesar by its advertising agency stating that the "use of a specific price in the national network creative would force all markets to run a common price and could compromise LCE's competitive value and/or profit margins in particular markets." In addition, plaintiffs point to various complaints by franchisees about the use of price point advertising.

Not only do plaintiffs contend that the advertising policies took away their pricing freedom, they also claim that Little Caesar threatened franchisees who failed to follow the nationally advertised prices. In support of this contention, however, plaintiffs have only produced one letter by a Little Caesar employee to a non-plaintiff franchisee who was not following the nationally advertised prices. In the September 1991 letter, Little Caesar told the franchisee that his "practice of altering the pricing on the national promotions to accommodate what your group believes to be 'above the average costs to operate' is not acceptable. You need to understand that the continuation of this practice will affect the future of your group's

relationship with Little Caesar." However, all three of the plaintiffs admit having no knowledge of this letter until it appeared during this litigation.

Finally, plaintiffs also contend that the disclaimers presented in each advertisement are not sufficient. They complain that they are not audible on TV ads, and that a Michigan regulation holds that the phrase "available at participating stores" is inadequate since it is merely a general disclaimer. *See* Mich.Admin. Code R 14.208(1).

In reply, Little Caesar points out that the franchisee who was threatened is not one of the plaintiffs, none of the plaintiffs have received similar letters even though they all have deviated from national prices, and plaintiffs have presented no evidence to show that they had knowledge of the September 1991 letter. As a result, Little Caesar contends that the September 1991 letter is irrelevant. In addition, plaintiffs have failed to show how the Michigan regulation applies, how it creates private rights in contract suits, or how it applies to Little Caesar's specific disclaimer which uses language which is different from that cited in the regulations.

The court finds that Little Caesar has not breached the provision of plaintiffs' franchise agreements giving them the freedom to set retail prices. As Little Caesar has demonstrated, plaintiffs are free of any contractual restrictions requiring them to follow the nationally advertised prices. Each advertisement contains a proper disclaimer that indicates that not all franchises may follow the advertised price.[1] Most importantly, plaintiffs have presented no evidence to show that they have been coerced in any way by Little Caesar to follow the national prices. In fact, all three admit to charging higher prices and to deviating from the national promotions. Plaintiffs have not submitted competent evidence showing that their freedom to set retail prices was restricted by anything other than their own business judgment. As a result, plaintiffs have not shown that Little Caesar has acted in breach of the franchise agreements.

Under the franchise agreements, although franchisees are free to set their own retail prices, they also have ceded all authority as to decisions concerning national advertisements to Little Caesar. As a result, plaintiffs cannot now complain that Little Caesar is breaching the agreement when it is simply exercising authority given to it under the franchise agreements themselves. This authority was bargained for by the parties, and it appears to be part of the overall scheme established by the franchise agreements, a scheme that in the case of these three plaintiffs has continued to allow individual franchisees the freedom to ultimately set their own price.

As plaintiffs readily admit, many franchisees eagerly support national advertisements based upon price, pointing to this program as the basis for their success. As is demonstrated by this suit, however, some franchisees are unhappy with the way in which Little Caesar has exercised its authority under the advertising provisions of the franchise agreements. To the court, there appears to be no dispute that such unhappiness merely amounts to dissatisfaction over the bargain received as part of the contract. Such unhappiness does not amount to a breach of contract when there is no dispute that plaintiffs still retain the freedom guaranteed in the franchise agreements. As a consequence, the court will grant Little Caesar's motion for summary judgment on this portion of the breach of contract claim.

### E. Count V—Breach of Contract and Supplier Rebates

Plaintiffs also claim breach of contract based upon their allegation that Little Caesar has failed to credit them with rebates, discounts, and bonuses paid by vendors to Blue Line as purportedly required by the franchise agreements and/or the implied covenant of good faith and fair dealing. Little Caesar is seeking summary judgment as to these claims on the basis that it is not required to make such credits under the franchise agreements, and that the implied

---

1. As part of its decision in this regard, the court notes that the regulation relied upon by plaintiffs is inapplicable. Little Caesar uses a specific disclaimer regarding price which satisfies R 14.208(1)–(2).

covenant is not applicable to the circumstances of this particular claim. However, Little Caesar is not seeking judgment on that portion of Count V relating to Hormel advertising allowance claims.

In support of its motion, Little Caesar cites the relevant franchise agreements which make no provision for crediting the accounts of franchisees with vendor rebates or discounts. In addition, Little Caesar contends that the implied covenant is inapplicable in this case because "Michigan courts will recognize an action for breach of an implied covenant of good faith and fair dealing where a 'party to a contract makes the manner of its performance a matter of its own discretion.'" *ParaData Computer Networks, Inc. v. Telebit Corp.*, 830 F.Supp. 1001, 1005 (E.D.Mich.1993) (citing *Burkhardt v. City Nat'l Bank*, 57 Mich.App. 649, 652, 226 N.W.2d 678 (1975)). In this instance, Little Caesar argues that no provision of the franchise agreement is of a discretionary nature so as to implicate the implied covenant of good faith. Little Caesar specifically excludes from its motion any claim involving advertising allowance payments made by Hormel to Blue Line for including Hormel logo in ads paid for by LCNAP. Little Caesar states that it believes its franchisees received full credit and will resolve this issue by settlement or further motion.

In response to this portion of Little Caesar's motion, plaintiffs only discuss the Hormel issue and unrelated LCNAP issues that Little Caesar explicitly exempted from the scope of its motion. As a result, the court finds that Little Caesar deserves summary judgment on the portion of Count V pertaining to the covenant of good faith and fair dealing and/or to the payment of supplier rebates other than the claim specifically excluded from this motion regarding the Hormel advertising allowance. Plaintiffs have not raised instances other than the Hormel situation that implicate a breach of contract claim in response to Little Caesar's motion as to this portion of Count V. As a result, since there is no dispute between the parties and plaintiffs have not presented any evidence to the contrary, the court will grant Little Caesar's motion for summary judgment as it relates to any breach of contract claim for failure to pay supplier rebates or discounts, except as delineated above.

## V. Plaintiffs' Motion for Class Certification

In their motion for class certification, plaintiffs have requested Rule 23(b)(2)–(3) certification of a class of Little Caesar franchisees under the following claims:

1. Rule 23(b)(3)—Count II—illegal tying arrangement.

2. Rule 23(b)(2)—(for injunctive and declaratory relief)—Count II-illegal tying arrangement.

3. Rule 23(b)(2)—(for injunctive declaratory relief)—Count V—breach of contract based upon national price advertising.

4. Rule 23(b)(2)—(for injunctive and declaratory relief)—Counts V & VI— misappropriation of LCNAP funds in breach of the contract and conversion of LCNAP funds.

Under Rule 23(a) of the Federal Rules of Civil Procedure, the following prerequisites must be satisfied before an action can proceed as a class action:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The burden is on the party seeking class certification to show that these prerequisites have been satisfied. *Senter v. General Motors Corp.*, 532 F.2d 511, 522 (6th Cir.1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

Once the requirements of Rule 23(a) have been satisfied, plaintiffs must demonstrate that the case falls within the guidelines set by Rule 23(b). Rule 23(b) provides as follows:

(b) Class Actions Maintainable. An Action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

.    .    .    .    .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.* In deciding whether to certify a class action, the court should not enquire into the merits of plaintiffs' claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974).

### A. The Magistrate Judge's Recommendations

In response to plaintiffs' motion for certification of one national class of Little Caesar franchisees as to each of their various claims, Magistrate Judge Pepe recommended that the court deny the request for a national class on the tying claim under Rule 23(b)(3), and instead certify sixteen separate regional classes, each divided into two different subclasses, for a total of thirty-two different groupings of franchisees. The sixteen regional classes recommended by the magistrate judge are based upon the sixteen warehouse/distribution regions established by Blue Line to cover the country. Neither

plaintiffs nor Little Caesar asked for or briefed certification of the regional classes suggested by the magistrate judge. In fact, both sides have filed objections to this portion of the magistrate judge's report.

Similarly, the magistrate judge recommended that the court certify, pursuant to Rule 23(b)(2), sixteen regional classes, and apparently thirty-two subclasses, of franchisees for purposes of injunctive and declaratory relief as to the tying claim. He also recommended that plaintiffs be ordered to solicit, within ninety days, class representatives for each of the thirteen regional classes and sixteen subclasses not already represented.

With regard to plaintiffs' other claims, the magistrate judge recommended certification of a national class under Rule 23(b)(2) on plaintiffs' claims under Counts V and VI regarding national price advertisements as a breach of contract and the handling of LCNAP funds. Because it has granted Little Caesar's motion for summary judgment on the breach of contract claim relating to national price advertisements, the court will not address the magistrate judge's recommendation to certify a national class as to this claim. Instead, the court will simply deny this portion of plaintiffs' class certification motion as moot.

### B. Class Certification and the Tying Claim

█ In his report, the magistrate judge found, and Little Caesar basically conceded, that the class requested by plaintiffs as to the tying claim satisfied the four requirements of Rule 23(a): numerosity, typicality, commonality, and adequate representation. However, the main fight as to the certification of a class for the tying claim centers around the Rule 23(b)(3) requirement that common issues of fact predominate over individual issues of fact. In this regard, the magistrate judge recognized that his recommendations could be significantly altered depending upon this court's rulings regarding the necessary components of a tying claim in response to Little Caesar's summary judgment motions.

Little Caesar contends that the circumstances of this case dictate that individual issues will predominate because the position of each franchisee is different, and Little Caesar's treatment of each franchisee and various independent distributors was different across the country. To Little Caesar, the key question is whether franchisees were *forced* to buy the tied product, thus satisfying the first element of a tying claim—the existence of a tying arrangement. Little Caesar contends that where, as here, there is not a uniform contract expressing the tie, the case will be decided by individual issues. In support of its contention, Little Caesar cites nineteen cases in which courts have denied a request for class certification because the forcing or coercive part of a tying arrangement had to be proven individually because there were no uniform ties, thus causing individual issues of fact to predominate. *See, e.g., Waldo v. North Am. Van Lines, Inc.,* 102 F.R.D. 807, 814 (W.D.Pa.1984); *Chase Parkway Garage, Inc. v. Subaru of New England, Inc.,* 94 F.R.D. 330, 332 (D.Mass. 1982); *Krehl v. Baskin–Robbins Ice Cream Co.,* 78 F.R.D. 108, 118–19 (C.D.Cal.1978).

In their motion for certification, plaintiffs argue that common issues of fact predominate in this case because of Little Caesar's "master plan" to control the distribution of supplies to its franchisees. The centerpiece of plaintiffs' motion is the 1989 licensing agreement between Little Caesar and its subsidiary, Blue Line. Under the agreement, Blue Line received the exclusive right to distribute "logoed products" to franchisees. Previously, the parties were in dispute as to the meaning of "logo products" under the licensing agreement, and the definition of this term is the subject of Little Caesar's first motion for partial summary judgment. As the court found above, however, the effect of the licensing agreement is limited to items given to a retail customer that bear a registered mark, such as logo paper items and individual packages of condiments. To plaintiffs, the licensing agreement is the common document and a piece of evidence that justifies a national class action. This document, combined with plaintiffs' ancillary facts relating to the alleged master plan and Little Caesar's refusals to approve certain independent distributors serve as the main basis for this class certification motion.

Plaintiffs contend that by controlling logoed products, Little Caesar could force its franchisees to purchase all supplies through Blue Line. In support of this analysis, plaintiffs have presented the joint affidavit of two economists who contend that the licensing agreement forces franchisees to purchase all goods from Blue Line because to do otherwise would require two-stop shopping. Under the licensing agreement, franchisees would have to purchase logoed products, as defined by the licensing agreement, from Blue Line. If the franchisee chooses to purchase all other supplies from an independent distributor, two separate deliveries would become necessary. Plaintiffs' economists contend that the two deliveries make utilizing an independent distributor unattractive and economically unfeasible as compared to simply purchasing all supplies through Blue Line.

In response, Little Caesar points out that each of the three named plaintiffs engages in multiple-stop shopping, receiving and purchasing various supplies from several different distributors based on different advantages provided by each. Most importantly, Little Caesar contends that the logoed products covered by the licensing agreement only include trademarked items that amount to a small percentage of the total supplies purchased by an average franchisees. As a result, because almost ninety-five percent of supplies are not even governed by the agreement, franchisees are free to purchase the vast majority of their supplies from independent distributors. Furthermore, all franchise agreements executed prior to mid–1990 specifically allow franchisees to seek approval of independent distributors of any supplied item except special dough and spice mix not covered in this lawsuit. As a result, these franchisees could still request an alternate supplier of logoed products, regardless of any internal Little Caesar directive. After mid–1990, the standard franchise agreement includes a clause that prevented franchisees from seeking alternate suppliers of logoed goods.

The important issue to Little Caesar for purposes of this motion, however, is that the situation of each franchisee is different depending upon the particular region in which it is located, its proximity to suppliers, the availability and willingness of independent distributors, and the actions of Little Caesar towards distributors and franchisees in the franchisee's particular area. Little Caesar contends that these issues make each franchisee different in terms of whether they were forced to purchase the tied item, thus amounting to a tying arrangement. In addition, the various issues listed above all relate to the question of the impact of the alleged tying arrangement on each different franchisee as it concerns damages.

In his report, the magistrate judge found that there is no express contract provision tying the purchase of supplies from Little Caesar/Blue Line to the obtaining of a Little Caesar franchise. In addition, the magistrate judge determined that in order to show the impact of a tie-in, *i.e.,* the fact of damages, plaintiffs will need to demonstrate that a regional market would support two distributors, and that there was an able alternate distributor willing to enter the market if approved by Little Caesar who could provide better prices and service. The magistrate judge concluded that such questions could only be proven on a region by region basis. Furthermore, he indicated that plaintiffs are not relying upon a claim of improper refusals to approve alternate distributors as a basis for class certification. He found that such a claim would necessarily involve a determination of individual issues. However, in their objections to the report and recommendation, plaintiffs assert that individual refusals to approve alternate distributors will play some role in their proposed class-wide proofs.

The court finds that it will accept in part and reject in part the magistrate judge's report and recommendation on plaintiffs' class certification motion. Most importantly, however, the court will deny plaintiffs' motion for class certification of the tying claim as currently proposed. It is clear that the magistrate judge recognized the complicated and individualized nature of the tying claims alleged in this case. Although he recognized

the problem, he came up with a solution that undermines the main request of plaintiffs' motion. The court agrees to a large extent with the magistrate judge's finding that the "bulk of the proofs on impact and substantial proofs on liability will be common only to franchisees within that Blue Line distribution region." He thus recognized, to a certain degree, that plaintiffs could not prove their case based upon national or uniform methods of proof, but must instead depend upon a multitude of local, regional, and individualized factors. On this basis, the magistrate judge then correctly concluded that this fact made certification of a national class impossible. However, he did not recognize that these same factors would make sixteen regional classes and thirty-two subclasses equally inappropriate. As a result, instead of relying upon his own findings regarding the regional and individualized nature of the claims, as well as the importance of the franchisee agreements signed after mid–1990 that he so clearly recognized, the magistrate judge has made a recommendation that this court finds unworkable and contrary to the dictates of Rule 23. The very nature of the recommendation for sixteen separate classes, not to mention the multiple subclasses, simply adds strength to the court's conclusion that the facts of this case militate against class certification, at least as it concerns the class proposed by plaintiffs.

To the court, it appears that the better choice is to follow the magistrate judge's logic and find that the factors that make a national class inappropriate also make regional classes inappropriate as well. The very fact that thirty-two separate subclasses are proposed by the magistrate judge when there are only 500 franchisees suggests that individual issues of fact predominate over common issues of fact. In addition, the recommendation flaunts the requirement of Rule 23(b)(3) that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." In this instance, it is hard to understand how a vast multitude of separate regional class actions would be superior to individual actions filed by those franchisees who object to Little Caesar's conduct. Under these circumstances, it appears that the magistrate

judge's recommendation is not superior to other methods of resolving the lawsuit.

The court's conclusion is not only based upon the factors found by the magistrate judge, but also upon the very nature of a tying claim under the antitrust laws. The main dispute between Little Caesar and plaintiffs is over whether coercion or forcing needs to be proven on an individualized basis in this case. There is no dispute that where a tying arrangement is apparent from the face of a contract, or from reasonable inferences based upon the contract and related documents, a national class would be appropriate. In this case, no such contract or set of contracts appears to fill this requirement. As a result, Little Caesar contends that proof of a tying claim will have to be done on an individual basis.

In essence, plaintiffs base their tying claim upon the master plan evidence and the 1989 licensing agreement. However, there is no evidence that any of the franchisees, except possibly the post mid–1990 franchisees, were even aware that such an internal agreement between Blue Line and Little Caesar existed. However, plaintiffs' contention appears to be that even though they might not have been aware of the tying arrangement, it was still a tying arrangement from which they can seek recovery. In response, Little Caesar cites to the nineteen cases referred to above to support its claim that proof of a tying arrangement in these circumstances is individual and not class wide. In addition, Little Caesar relies again upon the decision of the Supreme Court in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In *Jefferson Parish*, the Supreme Court, in addressing a tying claim, indicated that the "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* at 12, 104 S.Ct. at 1558.

Thus, the important inquiry centers on the buyer's state of mind and whether the buyer was forced or coerced into making the purchase of the tied product by the seller's conduct. As the court discussed previously, in cases involving an express contractual tie, the coercion imposed by the seller is manifest. Where there is not an express contractual tie, the plaintiff must prove the existence of the tying arrangement by other means. These means could include an unreasonable refusal to approve an alternate distributor, as could be claimed by plaintiff Smith, or by forcing a competing distributor out of a relevant market as could have been claimed by plaintiff Fields. In each case, the evidence proving the claim would appear on an individual basis and would not be susceptible to class treatment. *See Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir.1976). In *Dunkin' Donuts*, the court held that where

> plaintiff franchisees place no reliance on express contractual tie-ins, each, individually, must prove that his purchases were coerced as an element of establishing a prima facie case of illegal tying. The district court's class certification with respect to the tying claims was expressly premised on its rejection of the individual coercion doctrine. Accordingly, the certification should not have been granted.

*Id.* at 1226 (citations omitted).

In response to this general position stated by Little Caesar, plaintiffs, and the magistrate judge to a certain extent, argue that certain extrinsic facts and some relevant documents can establish a tying arrangement in such a way as to justify class treatment in this case. Plaintiffs rely upon *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir.1977), which allowed class certification where an express contractual tie-in was not present. In *Bogosian*, a refusal to grant class certification was reversed because a tying arrangement could be discerned from a set of lease documents common to all franchisees that reflected the imposition of an unreasonable condition based upon an economic analysis.

Plaintiffs analogize *Bogosian* to this case because they claim that the 1989 licensing agreement, combined with various ancillary evidence of Little Caesar's master plan to take over distribution to its franchisees, amounts to a class-wide unreasonable condition that tied the purchase of supplies to the

ownership of a franchise. By restricting the purchase of logoed products, plaintiffs contend that Little Caesar forced franchisees to buy their supplies through Blue Line in order to avoid the two-stop shopping discussed above. In addition, the licensing agreement was intended to force independent distributors out of the market by taking away the most profitable part of distribution, the sale of logoed products. In this way, plaintiffs contend that class certification is proper because proofs concerning the licensing agreement, its effect on franchisees, and proofs about the master plan are common and they predominate over individual issues.

However, as discussed earlier, the court finds that individual issues of fact relevant to each franchisee predominate over common issues of fact, thereby making it inappropriate to certify the particular class proposed by plaintiffs. It is quite apparent that "the necessity of an individual demonstration of actual coercion frustrates the ability of many suits to obtain class status." Earl W. Kintner & Joseph P. Bauer, 2 *Federal Antitrust Law* § 10.59, at 256 (1980, Supp.1995). Any actions Little Caesar may have taken against certain independent distributors would only be relevant to those certain franchisees who could have been serviced by them. The importance of one-stop shopping would also depend upon local conditions, distance to suppliers, and the preferences of the individual franchisees. Most importantly, as found by the magistrate judge, the impact of damages depends upon the peculiar conditions faced by each franchisee.

Both parties also cite to Sixth Circuit authority on the issue of whether forcing or coercion are an element of a tying arrangement. *See, e.g., Virtual Maintenance, Inc. v. Prime Computer, Inc.,* 11 F.3d 660 (6th Cir. 1993); *Bell v. Cherokee Aviation Corp.,* 660 F.2d 1123 (6th Cir.1981). However, these cases appear to be inconclusive or to support the general method of proof outlined by the court. But given the nature of the tying claim alleged here and the Supreme Court's language in *Jefferson Parish,* some sort of forcing, conditioning, or actual coercion must be individually shown by plaintiffs as part of their cause of action under the scheme presented by plaintiffs in support of their class certification motion.

As it appears to the court, the only arguable basis for certification of a national class action are the franchise agreements signed after mid–1990. Franchise agreements signed after mid–1990 prevent franchisees from requesting an alternate distributor of logoed products. Only plaintiff Smith signed one of these agreements, and it only applies to one of his three stores. For some reason, possibly because plaintiffs Fields and Hennessy, as well as a large number of current franchisees have franchise agreements that were signed prior to mid–1990, plaintiffs have not sought class certification based upon these later franchise agreements. It is not clear if plaintiff Smith has even alleged his one post mid–1990 agreement as the basis of an individual claim.

It could be argued that the post mid–1990 agreements, combined with the 1989 exclusive licensing agreement, evidence an express contractual tie-in of logoed products which could receive class treatment. The magistrate judge regarded the post mid–1990 agreements as so important as to justify the creation of thirty-two subclasses because of his finding that the later franchise agreements create a better opportunity for recovery. Little Caesar argues that even if there were a tie-in of logoed products, such a tie-in would not violate the antitrust laws. *See Principe v. McDonald's Corp.,* 631 F.2d 303 (4th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981). However, plaintiffs cite *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.1970), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972) for the proposition that such conduct would violate the antitrust laws. In any event, because the court will not delve into the merits of a possible claim by plaintiffs regarding a tie-in of logoed products, the court must simply assume that such a claim is viable. As a result, it could be argued, although plaintiffs do not advance this claim, that there is a basis for class certification of a claim by those franchisees who signed the post mid–1990 agreement that their ability to purchase logoed products was tied to their status as a franchisee. An obvious point of

dispute arises, however, as to whether such a class could be certified as to only the logoed products, or whether such a class could claim that a tie-in of the logoed products resulted in a tie-in of all supplies because of the alleged economic necessity of one-stop shopping. Furthermore, the issue remains whether a claim by all franchisees with agreements from after mid–1990 as to all supplies, rather than just logoed products, would satisfy the requirements of Rule 23(b)(3). The court declines to certify any such class, given that plaintiffs have made the choice not to pursue certification of such a group at this time.

In conclusion, the court finds that individual issues of fact predominate over common issues of fact in the proposed claims raised by plaintiffs as the basis for certification of a national class as to the tying arrangement. Because of the nature of plaintiffs' proposed claim, as found by the magistrate judge and by this court, the facts necessary to prove the tying arrangement alleged by plaintiffs are not conducive to class-wide treatment since the issue of whether individual franchisees were forced to purchase supplies necessitates individual proofs. As a result, the court will deny plaintiffs' motion for class certification. The court does acknowledge, however, that a national class could arguably be certified composed of franchisees governed by agreements executed after mid–1990. Because the plaintiffs have not proposed this class and the parties have not had an opportunity to brief the many issues involved, the court will not certify such a proposed class.

### C. Class Certification and LCNAP

Plaintiffs claim that defendant LCNAP has wrongly disbursed advertising funds collected from each of their franchisees. Plaintiffs assert that they will show that Little Caesar has converted some of the funds to its own use rather than for purely advertising purposes as required by the franchise agreement. They are seeking Rule 23(b)(2) certification of a class composed of all franchisees on the LCNAP claim.

In his report, the magistrate judge recommended Rule 23(b)(2) certification of plaintiffs' LCNAP claim. The magistrate judge found that because he had already recommended class certification of several other issues, he "saw little harm in also certifying this narrow claim."

In its objections, Little Caesar contends that resort to the device of a class action is unnecessary as to this claim. If plaintiffs prove their claim, Little Caesar admits that it would be forced to reimburse LCNAP for the full amount of the allegedly improper expenses. As a result, Little Caesar contends that in this way the entire class would benefit without the need for the cumbersome process of class certification.

The court similarly finds that class certification is inappropriate for the LCNAP claims presented in Counts V and VI. The magistrate judge's recommendation on this issue was made contingent upon the acceptance of his other recommendations in favor of the certification of regional or national classes on the tying claim and the claim relating to national price advertisements. Because the court will deny plaintiffs' motion for certification on the tying claim and will enter summary judgment in favor of Little Caesar on the price advertising claim, the magistrate judge's reasoning is not still be applicable to the LCNAP claim. As Little Caesar correctly points out, no benefit would be gained from certification since all the class members would benefit if the LCNAP claim is decided in their favor. As a result, the costs and burdens of class certification are not necessary in this instance.

### ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED that the magistrate judge's March 31, 1995 report and recommendation is **ACCEPTED IN PART** and **REJECTED IN PART**.

IT IS **FURTHER ORDERED** that plaintiffs' motion for class certification is **DENIED**.

IT IS **FURTHER ORDERED** that plaintiffs' motion to stay defendant Little Caesar's motions for partial summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that defendant Little Caesar's January 30, 1995 motion for partial summary judgment as to the scope of the 1989 licensing agreement is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant Little Caesar's February 28, 1995 motion for partial summary judgment and/or to dismiss is **GRANTED.** The court will enter judgment in favor of defendants as to all plaintiffs on Counts I and III, as to the Fields and Hennessy plaintiffs on Counts II and IV, as to the Smith plaintiffs on Counts II and IV before mid–1990, as to all plaintiffs regarding their breach of contract claim concerning supplier discounts other than Hormel, and as to all plaintiffs on the breach of contract claim in Count V relating to national price advertising.

**SO ORDERED.**