LITTLE CAESAR ENTERPRISES, INC., Plaintiff,

v.

Gary G. SMITH, et al., Defendants.

Gary G. Smith, et al., Plaintiffs,

v.

Little Caesar Enterprises, Inc., Defendant.

Civ. A. Nos. 93–40520, 93–40521.

United States District Court, E.D. Michigan, Southern Division.

Sept. 30, 1998.

Shawn M. Perry, Perry, Perry, and Perry, Minneapolis, MN, Richard A. Lockridge, Lockridge, Grindal, Nauen & Holstein P.L.L.P., Minneapolis, MN, Charles A. Turnbull, O'Reilly, Rancilio, Nitz, Andrews & Turnbull, P.C., Sterling Heights, MI, for Plaintiffs.

Irwin Alterman, Kemp, Klein, Umphrey & Endelman, Troy, MI, Alan C. Harnisch, Harnisch & Hohauser, P.C., Bingham Farms, MI, Stephen D. Susman, Susman Godfrey, L.L.P., Houston, TX, for Defendants.

*ORDER IN CASE NUMBER 93–40521 ACCEPTING (1) REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE PEPE ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (III); (2) REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE PEPE ON PLAINTIFFS' MOTION TO AMEND THIS COURT'S AUGUST 7, 1995 ORDER; and (3) REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE PEPE ON PLAINTIFFS' MOTION TO AMEND THE MARCH 31, 1997, CLASS CERTIFICATION ORDER*

GADOLA, District Judge.

Before the court are three separate reports and recommendations filed on March 31, 1998 by Magistrate Judge Steven D. Pepe. All three reports concern motions in case number 93–40521, in which plaintiffs are a class of approximately 400 franchisees of defendant, Little Caesar Enterprises, Inc. ("LCE"). This court, pursuant to 28 U.S.C. § 636(b)(1)(B), Fed.R.Civ.P. 72(b), and L.R. 72.1(d)(2) (E.D.Mich. Jan. 1, 1992), has conducted an extensive review of each report and recommendation, as well as the objections and responses submitted by the parties and the authority cited both by the parties and by the magistrate judge. After conducting a *de novo* review, the court accepts each report and recommendation as the court's findings and conclusions.

While the exhaustive analysis of the magistrate judge obviates the need for a further recitation of the facts and legal issues implicated in the instant motions, this court does wish to specifically address one objection filed by plaintiffs to the report and recommendation on defendant's motion for partial summary judgment (III). The lynchpin of the magistrate judge's recommendation that defendant's motion for summary judgment be granted as to the issue of market power in the tying market is the magistrate judge's conclusion that the plaintiffs are not entitled to a narrowed market definition of the type discussed in *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), and its progeny. In turn, the key to that conclusion was

the magistrate judge's finding that "the evidence does not show that during the limitations period for this lawsuit the defendant used its restrictive policy on the availability of logoed goods to alternate distributors to *exclude* any potential distributor from the market. Nor during the limitations period has any potential alternate distributor been *precluded from entering* the market to compete with Blue Line because of LCE's restriction on the availability of logoed goods." (Rep. & Rec. at 100(emphasis in original).)

Plaintiffs' primary contention with respect to the substance of this analysis is that the magistrate judge relied on an incorrect reading of the Sixth Circuit's decision in *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir.1997). Plaintiffs contend that the *PSI* court would have allowed a *Kodak*-type market definition to be submitted to a jury in that case if the antitrust plaintiff had submitted substantial evidence that the defendant had *either* changed its pricing structure and service policies after locking the plaintiff in *or* merely concealed material information prior to sale about its pricing structure and service policies. Accordingly, plaintiffs in this case contend that the magistrate judge erred when he read *PSI* and *Kodak* as requiring plaintiffs to produce evidence that LCE actually implemented its policy to exclude any potential alternate distributor from the market. Under plaintiffs' reading of *PSI*, the fact that the magistrate judge found that there was substantial evidence that LCE concealed information related to the ability of alternate distributors to compete without access to logoed goods is sufficient, in and of itself, to justify a narrowed market definition under *Kodak*.

However, this court agrees with the magistrate judge's interpretation of the holding of the *PSI* court. In *PSI*, the court held specifically that:

[i]f there were any evidence in the record that Honeywell *took advantage of its customers' imperfect information* in order to reap supracompetitive profits in the aftermarkets for its equipment, we would not hesitate to allow a *Kodak*-type theory to be submitted to the jury. However, we can

find nothing in the record or PSI's brief that alleges that Honeywell engaged in such activities.

*PSI*, 104 F.3d at 821 (emphasis added). This language seems to imply that an antitrust plaintiff must show that the defendant took some action in an attempt to capitalize on the antitrust plaintiff's imperfect information after the plaintiff became locked in relying on that imperfect information. Accordingly, this court agrees with the magistrate judge's conclusion that one requirement for a narrowed market definition under *Kodak* and *PSI* is that plaintiff must show that, "after a substantial number of customers have sunk significant costs that are not recoverable and face other switching costs, the seller takes some action changing its policy (or acting on a prior undisclosed policy) that takes advantage of its locked in customers' lack of information in order 'to reap supracompetitive profits' by imposing a burdensome tie-in." (Rep. & Rec. at 50.) Moreover, this court agrees with the conclusion of the magistrate judge that, in this case, "no reasonable jury could find that during the limitations period LCE used its power to deny access to logoed goods to alternate distributors to handicap or exclude any rival distributors." (Rep. & Rec. at 101.)

Accordingly, this court having reviewed the submissions of the parties and being fully advised in the premises,

It is hereby **ORDERED** that the magistrate judge's March 31, 1998 report and recommendation on defendant's motion for partial summary judgment (III) is **ADOPTED**.

It is further **ORDERED** that defendant's motion for partial summary judgment is **DENIED** on the issue of there being one product and not two, and **GRANTED** on the issue that plaintiffs have insufficient proof of market power in the tying product market.

It is further **ORDERED** that the magistrate judge's March 31, 1998 report and recommendation on plaintiffs' motion to amend this court's August 7, 1995 order is **ADOPTED**.

It is further **ORDERED** that plaintiffs' motion pursuant to Rule 54(b) is **DENIED**.

It is further **ORDERED** that the magistrate judge's March 31, 1998 report and recommendation on plaintiffs' motion to amend the March 31, 1997, class certification order is **ADOPTED**.

It is further **ORDERED** that plaintiffs' motion to amend the March 31, 1997, class certification order is **DENIED**.

**SO ORDERED.**

### REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION TO AMEND THIS COURT'S AUGUST 7, 1995, OR-DER

PEPE, United State Magistrate Judge.

Plaintiffs have filed a motion under Fed. R.Civ.P. 54(b) to amend the August 7, 1995, order of this Court granting partial summary judgment on the tying claims of plaintiffs Hennessy and Fields.[1] In its August 7, 1995, opinion this Court denied nationwide class certification for franchisees who held pre–1990 Franchise Agreements, as did plaintiffs Hennessy and Fields. The Court also granted summary judgment on the tying claims of plaintiffs Hennessy and Fields because they did not exercise their contract rights to request an alternate distributor to Blue Line Distributing, Inc. ("Blue Line"), and because they could not prove that they did not make such a request because they knew it would be futile to do so. Thus, in the absence of an express tying arrangement (or a defendant's admission) plaintiffs Hennessy and Fields could not prove that they were "forced" or "coerced" to buy all goods from Blue Line as those terms are used in the antitrust cases to show that there was an illegal tie. *Little Caesar Enterprises, Inc. v. Smith,* 895 F.Supp. 884, 894–96 (E.D.Mich.1995).

Plaintiffs bring this motion asserting that since the August 7, 1995, ruling they have uncovered significant new evidence, and other courts, including the Sixth Circuit, have clarified the law concerning tying claims.

They note that much of this new evidence was examined in the Court's certification of a class involving Little Caesar franchisees who signed post–mid–1990 Franchise Agreements. *Little Caesar Enter., Inc. v. Smith,* 172 F.R.D. 236 (E.D.Mich.1997). Plaintiffs also assert that the Court did not expressly address the plaintiffs' claim of fraudulent concealment of the 1989 Exclusive Licensing Agreement between Little Caesar and Blue Line in its earlier opinion.

The factual background as well as a substantial summary of plaintiffs' evidence, including the newly discovered evidence, is set out in detail in Section V.A, B and C of my March 31, 1998, Report and Recommendation on Defendant's Motion for Partial Summary Judgment (hereinafter "March 1998 Summary Judgment Report"). These facts and the background and procedural facts in that opinion are incorporated here by reference.

### I. PROCEDURAL BACKGROUND:

According to Fed.R.Civ.P. 54(b), when multiple claims for relief are presented "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties" if the Court determines that there is no just reason for delay. The Rule notes in addition:

> In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

■ In effect, Rule 54 reserves for the court the power to revise any interim judgments prior to the direction of the entry of final judgment. While the Court has the

---

1. This case is consolidated. Because Fields and Hennessy were co-plaintiffs of Gary Smith in Case No. 93–CV–40521 against LCE, this Report and Recommendation refers to LCE as the defendant. Plaintiffs' claims were initially brought against three defendants, LCE, Blue Line Distributing, Inc., and Little Caesar National Advertis-

ing Program, Inc. ("LCNAP"). Only LCE and Blue Line are accused defendants on the claims involved in this motion. After this suit was filed, LCE merged with Blue Line. Thus, LCE is the sole remaining defendant for purposes of this motion.

power to modify its non-final judgments, plaintiffs' motion seeking to trigger this power is, in effect, a motion to amend or alter a judgment or for reconsideration. Under our Local Rule 7.1(h)(3):

> The movant shall not only demonstrate a palpable defect by which the Court and the parties have been misled but also show that a different disposition of the case must result from a correction thereof.

*Cale v. Johnson,* 861 F.2d 943, 947 (6th Cir.1988), cites from 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478 pp. 790–95 (1981):

> [T]he major grounds that justify reconsideration involve an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

This section also notes concern when one judge is reexamining an opinion of another judge that there are concerns both of "an undesirable denial of comity between colleagues" and also "unfettered reexamination would unduly encourage efforts to shop around from one judge to another." *Id.* at 795 (footnotes omitted).

Judge Learned Hand in *Dictograph Products Co. v. Sonotone Corp.,* 230 F.2d 131, 134 (2d Cir.), *cert dismissed,* 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956), considered both the factors of "mutual respect between members of the same court," and concerns that "the defeated party might shop around in hopes of finding a judge more favorably disposed." Judge Hand concluded:

> The first reason is clearly untenable: judicial sensibilities should play no part in the disposition of suitors' rights. The second reason has indeed much to recommend it, and, as a matter of practice, has been universally regarded a sufficient reason for treating the first ruling as conclusive. It is, however, quite another question whether under all circumstances it makes the first ruling immune from reconsideration.

*Id.* at 134–35. The Sixth Circuit in *Cale* cited *Corporacion de Mercadeo Agricola v. Mellon Bank International,* 608 F.2d 43, 48 (2d Cir.1979), noting:

We held that on a renewed motion for summary judgment before a second judge, the district court must balance the need for finality against the forcefulness of any new evidence and the demands of justice. With respect to a non-appealable denial of summary judgment [such as in the present case where the denial is not yet appealable], the law of the case is not a limit on the court's jurisdiction, but a rule of practice which may be departed from in the sound discretion of the district court.

In considering the challenge of the appellant in *Cale,* the appellant asserted that the new evidence, which was only an affidavit of the defendant, was insufficient. The Sixth Circuit noted:

> We need not decide whether the new evidence considered by the district court meets some threshold test of sufficiency .... The district court does not have to rely on new evidence; if the demands of justice require, it may simply change its mind.

861 F.2d at 948.

## II. THE PRIOR SUBSTANTIVE RULING:

As this Court has noted in its earlier summary judgment opinion the *prima facie* elements of a *per se* tie-in claim are:

1. there must be a tying arrangement between two distinct products;

2. the seller must have sufficient economic power in the tying market to restrain appreciably competition in the tied product market; and

3. the amount of commerce affected must not be insubstantial.

*Little Caesar Enter., Inc. v. Smith,* 895 F.Supp. 884, 894 (E.D.Mich.1995).

This case does not involve express contractual language that directly, or by necessary implication, binds the purchaser to buying the tied product in order to obtain the tying product. Nor does it involve the admission of a tie by the defendant. Thus the Court in its earlier opinion was considering the issue of whether there was other suitable evidence to fulfill *prima facie* element #1 to show that there was a tying arrangement between

two products within the meaning of the *per se* tying rule. In the absence of an express or admitted tie, the case law has demonstrated there must be some independent proof of "forcing" or "coercion" in order to demonstrate a tie.

In the Court's earlier opinion, it ruled against plaintiffs Hennessy and Fields because of their inability to show either: (1) that they objected to Blue Line as a distributor by requesting approval of an alternate distributor; or (2) that they were aware that the approval process was futile, thus excusing their need to exercise their contractual rights to request an alternate distributor to Blue Line. The Court noted that prior to Smith's April 1992 request for AmeriServ to be an alternate distributor, which denial plaintiff Smith contends was wrongful, his earlier 1988 efforts to seek an alternate distributor along with franchisees was not pursued because "after a series of meetings, Smith's concerns were addressed and he decided to stay with Blue Line." *Id.* at 895. With respect to Fields and Hennessy, the Court noted that Hennessy never sought an alternate distributor. Nor did Fields, and she "was only aware of the single rejection of AmeriServ as an alternate distributor for Smith." *Id.* at 895–96. The Court concluded:

> As to plaintiffs Hennessy and Fields, however, the court will grant Little Cae-

sar's motion for summary judgment on the tying claim as to these two plaintiffs. Within the applicable time period, neither one requested approval of an independent distributor or were subject to an explicit contractual tie-in as part of the franchise agreements by which they were bound. Furthermore, these plaintiffs cannot show that had they made a request for an alternate distributor, it would have been futile. As a result, there is no indication that either Fields or Hennessy was forced to continue purchasing supplies through Little Caesar/Blue Line.

*Id.* at 896.

■ In a setting where the franchisee can only obtain necessary goods to operate the franchise from a distributor "approved" by the franchisor, the question of whether there is an illegal tie within the meaning of *prima facie* element # 1 on the *per se* prohibition against tying can be proven in four distinct ways:

1. the tying arrangement is expressed in some written contract instrument;

2. the defendant admits that there is a tying arrangement;

3. the franchisee requested an alternate distributor, which alternate distributor is wrongfully denied approval for reasons motivated by an intent to restrain competition;[2]

**2.** If a franchisor has a legitimate business justification for denying a franchisee's request for an alternate distributor, the mere fact that the franchisor may also have a secondary desire not to face competition does not involve a violation of the antitrust laws. In other words, if the defendant can demonstrate that they would have denied the request for an alternate distributor even in the absence of the fact that this would reduce the competition they would face, the denial would be justified and no antitrust law violated. Obviously a jury could determine either (1) that the business justification was a pretext, or alternatively (2) the business justification, while of some degree of legitimacy, would not have been sufficient to warrant the denial in the absence of the defendant's desire to restrain competition. *Cf. Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (in a constitutional context, once a plaintiff has established a *prima facie* case that the defendant's action was taken against him in retaliation for the exercise of a constitutional right, the burden shifts to the defendant to show

by a preponderance of evidence that he would have taken the same action even if the plaintiff had not engaged in the constitutionally protected action.) While this is not the central issue of this motion, and I am unaware of any specific antitrust case law on this precise point, the policy considerations lying behind the *Mount Healthy* case are consistent with and applicable to the policy considerations in antitrust law in precluding a franchisor from using otherwise legitimate reasons for denying an alternate distributor as a cover for a denial that is actually motivated by a desire to restrain competition. Courts in the constitutional context have made it clear that an act in retaliation for the exercise of a constitutionally protected right is actionable under 42 U.S.C. § 1983 even if the act, when taken for different reasons, would have been proper. *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988); *Howland v. Kilquist,* 833 F.2d 639, 644 (7th Cir.1987); *Wright v. Newsome,* 795 F.2d 964, 968 (11th Cir.1986) (*per curiam*). Similar analysis has been made in the antitrust context. *See Schine Chain Theatres v. United States,* 334 U.S.

4. The approval process can be demonstrated to be futile, including use of internal documents of the defendant (possibly obtained only after discovery in the litigation); and

    a. the franchisee did not apply for an alternate distributor because of the knowledge that the time and effort would be futile, or

    b. the futility could be demonstrated by sufficient evidence of other denials of other franchisees' requests for alternate distributors even if the individual plaintiff did not make a request for an alternate distributor.

## III.  PLAINTIFFS' ASSERTIONS:

■  Plaintiffs in their motion argue that *PSI Repair Servs., Inc. v. Honeywell, Inc.,* 104 F.3d 811 (6th Cir.), *cert. denied,* 520 U.S. 1265, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997), indicated that when a defendant conceals from a customer at the time of purchase a policy of tying two products together or a change in policy, in such cases that the tie could be found to violate § 1 of the Sherman Act. Plaintiffs are correct that in the present case if LCE failed to disclose its policy of refusing to approve alternate distributors at the time when Fields and Hennessy signed franchise agreements giving them contractual rights to seek an alternate distributor, and then, after Fields and Hennessy purchased their franchises and became "locked in" LCE implemented its policy of refusing to approve an alternate distributor request, plaintiffs Fields and Hennessy could assert a *Kodak*-type market for the tying product. Yet, for reasons stated in my Report and Recommendation on LCE's motion for partial summary judgment, the *Kodak/PSI* analysis deals with the second *prima facie* element of a *per se* tie-in claim. The Court's August 7, 1995, opinion dealt with the first *prima facie* element of a tying claim—was there a forced tie between the continuing operation of a Little Caesar franchise and the purchase from Blue Line of all goods necessary to operate such a franchise?

110, 119, 68 S.Ct. 947, 92 L.Ed. 1245 (1948) ("Even an other otherwise lawful device may be used as a weapon in restraint of trade or in an

## IV.  PROOF OF FUTILITY:

As noted by Professors Areeda, Hovenkamp and Elhauge in their antitrust treatise:

> Nor should a tie be deemed to arise when the defendant announces quality standards under which he stands ready to approve, without profit to himself, as many qualified suppliers as wish to provide the tied product, although he has not yet approved many or any. To be sure, *a tie-in exists if the willingness to approve others is merely a charade.* Normally, however, the expressed willingness to approve all comers meeting a standard will suffice absent such contrary evidence as internal records indicating that the defendant would not have approved others, or the defendant's unjustified denial of requests to approve disinterested suppliers, or other conduct leading reasonable buyers to understand the defendant was unwilling to approve such requests.

X AREEDA, HOVENKAMP AND ELHAUGE, ANTITRUST LAW (1990), ¶ 1753g, at 299–300 (emphasis supplied, footnotes omitted).

Later the Areeda authors add:

> One recurring issue is whether any tying condition may fairly be found when buyers took the package without requesting separate provision. The answer is affirmative *when such a request would be futile. The courts have typically demanded that futility be proved with evidence of what has occurred in the marketplace.* They have not asked whether futility may fairly be presumed when the tribunal knows of the defendant's silent tying condition even though buyers did not. We would so presume on the ground that forcing the parties to litigate and the tribunal to resolve the futility issue seems wasteful when we can take the defendant's own word that such a request would have been futile.

*Id.* at ¶ 1755b, pp. 311–12 (emphasis supplied).

effort to monopolize a part of trade or commerce.")

In examining how futility is proven, the authors state:

> Evidence that requests for separate provision are futile include defendant's announced policy that he will not sell product A separately, rebuffed requests, refusals to sell or continue selling to those who do that his product B, putting two products in one box, or any similar conduct creating a reasonable impression of such a policy. For convenience in administering the antitrust laws, moreover, we would infer futility from defendant's internal documents or admissions known to the tribunal—though not to customers—that defendant would not sell A separately.

*Id.* at ¶ 1756e, p. 325.

In the present case, there are no announced statements by LCE that it would not approve alternative distributors. There were only two refusals during the limitations period, one of AmeriServ in the southeastern United States (and possibly nationwide) and one of Chopping Block in Wisconsin. Plaintiffs have only challenged the defendant's reasons for denying the AmeriServ application. They have not challenged the business justification for LCE's denial of Chopping Block that—it did not intend to carry a full line of products needed by Little Caesar franchisees.

Before considering plaintiffs' new evidence, it is helpful to review the cases the Areeda treatise cites on proof of futility in seeking seller approvals. This will set a context for determining whether the new evidence in light of the existing evidence and or a fuller understanding the of law warrant a modification of this Court's earlier determination to correct clear error or prevent manifest injustice.

In support of its proposition that a tie can exist where the willingness to approve other suppliers is a "charade," the Areeda authors cite *Tic–X–Press, Inc. v. Omni Promotions Co. of Ga.,* 815 F.2d 1407 (11th Cir.1987); *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705 (11th Cir.1984); *Advance Business Systems and Supply Co. v. SCM Corp.,* 415 F.2d 55 (4th Cir.1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

In *Tic–X–Press,* Atlanta Coliseum, Inc. ("ACI"), Omni Promotions Company, Limited ("TOPCOL" also "PROMOTIONS") had rights to lease the uniquely large Omni Coliseum for large concerts with audiences of 4,000 to 16,000. ACI, TOPCOL and SEATS were owned by a common entity and functioned as a single enterprise. In renting the Omni Coliseum, TOPCOL used a form agreement requiring tickets to be sold by PROMOTIONS ("TOPCOL") "or at other ticket agencies approved by PROMOTIONS ..." 815 F.2d at 1412. This was the "approved source" provision. PROMOTIONS did its ticket sales through SEATS. Defendants had no "written specifications on procedures for approving other ticketing services." *Id.* Plaintiff, Tic–X–Press, Inc. ("TXP"), had unsuccessfully requested on a number of occasions to sell some or all tickets to Omni concerts. TXP and SEATS were the only two ticket companies in Atlanta selling at multiple locations throughout the area. In *Tic–X–Press,* no promoter of a concert at the Omni had ever requested approval of another ticketing agency other than SEATS, and no one had requested TXP to see if the defendant would approve them. One promoter, Jim Veal, indicated he would have used TXP if they had been approved. *Id.* at 1416.

The Eleventh Circuit rejected defendants' contention that proof of coercion in this case required proof that at least some of the promoters had requested permission to have TXP do their ticketing in the Omni. In reaching its decision, the Circuit opinion noted:

> In this case, the court found other facts tending to show that the use of SEATS was not voluntary, at least as to Jim Veal. More specifically, it found that promoters did not attempt to use other ticketing agencies because they understood through years of dealing with [TOPCOL] and using the Agreement that they were required to use SEATS.

*Id.* at 1418–19.

\* \* \* \* \* \*

Furthermore, it also found that the appellants had never approved another ticket agency and that they had never established written standards and procedures

for approving other agencies. *Cf. Kentucky Fried Chicken, supra,* 549 F.2d at 378 (approval clause reasonable where seller had already approved 10 suppliers and had never refused a request for approval). Given these findings, it is reasonable to conclude that the approval clause was somewhat bogus under the circumstances present in this case and that promoters did not have meaningful freedom of choice in the tied market.

*Id.* at 1417.[3] The Court acknowledged that the subjective perception of the buyer standing alone could not be enough to support a finding of liability. Yet, there were "several other factors" including "the language of the Producer's Agreement that sustained the lower court's finding."

In the present case, plaintiffs are not relying on subjective understanding, but rather other evidence to show that the alternate supplier clause was a bogus provision during the relevant time periods. In *Tic–X–Press,* the lower court had found the promoters, from years of dealings, understood that they were required to use SEATS when they promoted an event at the Omni. Thus, *Tic–X–Press* involved an "understood condition" as that term is defined in the Areeda treatise at ¶ 1754c; *see Little Caesar Enterprises, Inc. v. Smith,* 172 F.R.D. 236, 256 (E.D.Mich. 1997). The present case involves no apparent evidence of an understood condition. While plaintiffs' counsel argues now, in part from internal documents, that the "second source" provisions of Section VII of the Franchise Agreement were bogus and application for an alternate distributor would be futile, neither plaintiff asserts his or her understanding that seeking an alternate distributor was futile.

The Areeda authors also cite *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705 (11th Cir.1984), in support of their contention that an approved source clause can be a "charade." In that case the franchisor, Waffle House, Inc., required its franchisees to purchase equipment from approved sources. At the time, the only approved source for its restaurant was The Hickman Company, and its only approved source for vending machines was Metro Distributors, Inc. *Id.* at 710, 712. Waffle House had financial interests in both of these companies. While not resolving the issue, the Eleventh Circuit notes that:

> Defendants contend that plaintiffs never sought to purchase equipment or obtain vending services from sources other than The Hickman Company and Metro Distributors, Inc. Plaintiffs' position is that to have done so would have been futile because they had been told that no other sources would be approved. Each of these contentions presents disputes of fact. Unless plaintiffs can prove they were coerced into purchasing equipment and vending services from The Hickman Company and Metro Distributor, Inc., their claim that illegal ties existed will fail.

*Id.* at 712. The Court does not discuss what evidence would be sufficient in order for the plaintiffs in this case to demonstrate that a request for an alternate source of equipment would be futile. While not clear from the opinion, it suggests that plaintiffs "had been told [by defendant] that no other sources would be approved." The present case involves no similar facts by agents or employees of LCE or Blue Line to prove futility.

The final case cited by the AREEDA authors on the "approved source/charade" issue is *Advance Business Systems and Supply Co. v. SCM Corp.,* 415 F.2d 55 (4th Cir.1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). SCM sold extended warranties with various of its machines. The warranty agreement noted that the SCM copying machines were designed to give excellent performance when used with SCM photocopy supplies. Its warranty stated that:

> SCM reserves the right to suspend this agreement as to any machines in which other suppliers' paper or other supplies

---

**3.** The court also rejected the fact that several promoters would have used SEATS regardless, noting that the tying arrangement prevented them from making that choice freely. We reiterate that the principal evil of tie-ins is that they foreclose competition *on the merits* in the tied market. *Id.* at 1417.

have been used. Agreement shall not apply to any repairs made necessary by the use in SCM photocopy machines dispersant, replenisher, electrostatic copy paper or other photocopy supplies made by other than SCM and not approved by SCM for use in SCM equipment.

*Id.* at 65. It was found that SCM never approved any competitive paper for use in its machine even though they knew that Nashua paper was "safe and as effective as SCM paper for such use." *Id.* This pre-*Fortner II* and pre-*Kodak* case upheld the lower court finding "that the competitive supplies clauses in the service contracts gave rise to a *per se* violation of the Sherman Act ..." *Id.* at 65.[4]

The Areeda authors also cite *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir.1979), as a case "implying that evidence that requests for approval were unreasonably denied would have sufficed to show a tie." AREEDA, ET AL., p. 300 n. 47. The *Photovest* case actually held that because

four of the Photovest franchises were permitted to purchase processing from alternate Fotomat-approved sources, the tying arrangement was not established sufficiently. Photovest did not show that Fotomat unreasonably withheld approval. Indeed, it appears that Photovest never submitted a processor to Fotomat for approval during this time period. Photovest contends that the tie was nevertheless sufficiently established because Fotomat did not provide a list of approved processors. This does not in our opinion establish the requisite condition for illegal tying. Given the contractual language, which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause.

606 F.2d at 722.[5]

In the present case, there are not the proofs of futility available in *Tic–X–Press,*

---

4. This *SCM* case also found a tie-in between the paper and the rental agreements of the SCM photocopying machines. While there was no express tie, the rental agreements acknowledge that "supplies which may cause damage or deterioration will not be used in the machines." 415 F.2d at 63. The lower court found a pattern of conduct by the SCM representatives "to threaten the cancellation of rental agreements with customers who used competitive supplies in their SCM machines[,]" and SCM representatives specifically misinformed customers that "the use of Nashua supplies would cause service calls and interrupt the continuous operation of their SCM machines[,]" and defendants did this to induce rental customers to stop dealing with the plaintiff who sold Nashua paper. *Id.* at 63 and 64. The contract noted "SCM reserves the right to suspend this agreement as to any machines in which other suppliers' paper or other supplies have been used." *Id.* at 65. This has later been referred to as the "tying by lying" theory.

In *SCM*, the misstatement of fact about Nashua paper coupled with the threat that the machines could break down and the service contracts could be voided induced people to purchase SCM paper, and thus this was causally linked to the establishment of the tie-in. In the present case, if, as plaintiffs assert, defendant's contractual agreement to approve alternate distributors was a misrepresentation, this representation that they would approve alternate sources did not "cause" any tie-in of the use of Blue Line. In *SCM*, the buyers relying on the representation of the defendant would be induced to buy the defendant's paper. In the present case, any franchisee rely-

ing on the representation of the defendant would be induced to believing they could seek an alternate source of goods other than Blue Line. Thus, even if plaintiffs are correct in their contention that the second source provision of the franchise agreement was a "charade," this does not result in "tying by lying" because relying on this representation did not cause the tie. At most, relying on this representation may have caused the franchisee to sign a franchise agreement and become locked in. This lock-in issue may possibly relate to market power but this misrepresentation does not directly implicate the question of whether there is a tie. In the present case, if there is a tie because the second source provision of the contract is a charade, the tie is not caused by the second source provision in the Franchise Agreement and representation by the defendant, but rather by the defendant's allegedly wrongful refusal to honor it.

5. In the *Photovest* case, for a period prior to the June 1971 *Chicken Delight* case, 12 of the 16 franchisees had signed agreements that required them to buy processing from Fotomat. Thus, there was an express tie in the tying contract. Four of the Photovest franchisees did not have such restrictive language in their contract but rather were permitted to obtain processing from Fotomat-approved sources. The Seventh Circuit ruled against the plaintiff with respect to these franchisees because plaintiff never attempted to exercise their contract rights and thus could not prove wrongful refusals to constitute a *de facto* tie-in.

*Midwestern Waffles,* or *Advance Business Systems.* There is no evidence of an understood condition as in *Tic–X–Press.* There is no defendant's statement that "no other sources would be approved" as apparently occurred in *Waffle House,* and there is no evidence of failing to approve a locally qualified alternate source as there was in *Advance Business Systems* where SCM refused to authorize use of Nashua paper even though they knew it was of suitable quality.

The case of Fields and Hennessy is closer to that of the four Photovest franchisees who could seek an alternate source for having their film processed other than by franchisor, Fotomat, but failed to do so. The Seventh Circuit found that these plaintiffs failed to demonstrate a tying arrangement because they could not prove futility.

## V. PLAINTIFFS FIELDS' AND HENNESSY'S NEW EVIDENCE:

Two of the new documents discovered since the Court's earlier ruling are evidence that LCE intended to use its exclusive rights over logoed goods to make Blue Line the exclusive source of those goods and this was done "to more effectively posture Blue Line vis-a-vis its competition." David Deal's March 1989 Memo to LCE Board Member Jay Bielfield. Ex.3, Perry April 1997 Declaration, noted in the March 1998 Summary Judgment Report at 66.

The second newly discovered document was in a November 12, 1991, memo from David Deal to David Kushner, he notes:

> The original intent of the agreement was to provide an exclusive arrangement for Blue Line to distribute paper products and other supplies to Little Caesar restaurants so that Little Caesar would be able to exclude third parties from these offerings. It was not contemplated at that time to put in place an even broader agreement to involve products that do not ultimately find their way to the customer, such as uniforms, signage, etc.

> Plaintiff's Exh. 21.

Lockridge August 1995 Declaration, Ex. 21, March 1998 Summary Judgment Report at 66–67.

These new documents reinforce other earlier discovered documents from which a jury could find that LCE intended to use its control over its logoed goods to require that franchisees buy them from its subsidiary Blue Line. The undisclosed 1989 Exclusive Licensing Agreement is further evidence of this intent. A jury could also find that during the relevant statute of limitations period for this litigation, LCE intended to deny access to logoed goods to any alternate distributor who might compete with Blue Line knowing the lack of logoed goods would make it more difficult for rivals to compete with Blue Line. Yet, for reasons stated in the March 1998 Summary Judgment Report, there is not sufficient evidence in the record that during the limitations period LCE ever actually had to implement this covert policy. Thus, these two documents and the covert 1989 Licensing Agreement are not directly relevant to Fields' and Hennessy's claim that seeking an alternate distributor would be futile. The discovery of additional evidence of this LCE plan, including the 1989 Exclusive Licensing Agreement, also had no effect on the statute of limitations period because there is no evidence that LCE during the limitations period acted on this policy and used it to exclude an existing rival distributor or to prevent entry of any such rival.

The critical evidence relevant to Fields' and Hennessy's motion is whether any new documents were discovered that indicated a plan or intention of LCE to deny all applications for an alternate distributor. One of the new documents does deal with this issue. Plaintiffs have discovered a November 26, 1991, internal memorandum from Matt Ilitch to Al Thompson regarding franchisee Chuck Walls' request for an alternate distributor in the Madison, Wisconsin, area which notes:

> There is no formal approval process for outside food and paper distributors where there is an existing Blue Line distribution center in the market area.

> \* \* \* \* \* \*

> In any event, Blue Line will not reveal to any distributor, information about Little Caesar products and how to get them without first establishing that Blue Line has

not fulfilled both pricing and service obligations.

Ex, 4 Lockridge December 1996 Declaration, noted in the March 1998 Summary Judgment Report at 74–75. This document suggests that Blue Line would not cooperate in the approval process of an alternate distributor if a Blue Line warehouse was servicing the Little Caesar franchisees in that area.

The other document of which this Court was aware in August 1996, was a follow-up July 31, 1991, letter from Matt Ilitch to Kathy Campbell of LCE's Associate Distributor Leprino Foods in California. Matt Ilitch wrote her an official letter informing her that Blue Line would begin distribution operations in California and Nevada from a warehouse in Stockton, California, by mid-September 1991. He added:

> Please know that Leprino Foods did not fail as our associate distributor. Rather, it is part of the Little Caesar master plan to control distribution of Little Caesar brand products through its Blue Line distribution division. In fact, of all of our past and present associate distributors, Leprino Foods' reputation is at the top.

Lockridge August 1995, Declaration, Ex. 7, noted in the March 1998 Summary Judgment Report at 73.

The Matthew Ilitch 1991 memo to Al Thompson and his 1991 letter to Kathy Campbell are the only "internal" documents allegedly indicating a LCE policy not to approve alternative distributors. Taking defendant's word from internal documents that defendant would not approve qualified distributors would suffice for the Areeda authors to prove futility. Yet, the internal documents must clearly express company policy. These two documents are not the clear internal documents of a policy not to approve an alternate source that I believe the Areeda authors had in mind in the above quoted sections of their treatise. These two documents coupled with the denial of Ameri-Serv and Chopping Block are not sufficient evidence from which a jury could determine "futility" in the absence of more denied requests for approval or other evidence of futility. This would be the case even in the absence of the 1995 approvals of three alternate distributors.

The "coercion" or "forcing" that the prohibition on tying is concerned with are seller abuses of power to restrain buyer choices as to product *B*—here the goods needed to operate a Little Caesar franchise. It is sustainable abuse of market power that concerns antitrust. Antitrust remedies generally should not be available as the initial recourse where simple market remedies exist and are unexhausted.

There is no failure of the market if contract protections are available to franchisees to seek a second source of products needed to operate a franchise. The second source language in Section VII of the Little Caesar Franchise Agreement is a contract safeguard (like fixed pricing, a pricing formula or most favored customer clauses) that a prudent franchisee would seek to protect against franchisor opportunism.

LCE can exercise sustainable power in the aftermarket for goods needed to operate a Little Caesar franchise (product *B*) only if it could continue to exclude competition. The rejection of AmeriServ,[6] even if wrongful, would not result in sustainable exclusion of other distributors from the market unless that rejection caused all other franchisees and possible distributors to give up hopes of applying to be an alternate distributor. Without more proofs than presently available, plaintiffs Fields and Hennessy do not have proof that the AmeriServ rejection caused this result.

The rejection of AmeriServ's application to be an alternative distributor did not alone cause the *sustained* market failure. The reluctance of other franchisees or alternative distributor to seek approval to compete with Blue Line contributed to this result. Unlike the plaintiffs in *Tic–X–Press, Advance Business Systems, Jefferson Parish, Kodak,* and *PSI,* who had no contract rights to counter the defendant's alleged abuse of power, here

---

**6.** In the present case, there is really only one contested denial during the limitations period, that of AmeriServ.

each franchisee individually and multiple franchisees collectively had legal entitlements in their Franchise Agreement to attempt to avoid precisely the type of franchisor opportunism of which they now accuse LCE. They knew the monopoly of Blue Line and chose not to challenge it by seeking alternative distributors individually or collectively. If these franchisees with available contract remedies were not sufficiently dissatisfied to challenge LCE with their contract tools the LCE Franchise Agreement gave them, courts should be reluctant to cobble up "antitrust remedies" for them. This is not to say that antitrust remedies should not be available to wronged franchisees, but only that in the absence of a clearer showing of futility than exists in this case, they should not be too readily available.

If a single denial of approval of an alternate source coupled with two internal documents from a single author that suggest a tie will turn a wrongful denial contract case into an treble damages antitrust case for any other franchisee, possibly involving a nationwide class, there are significant social costs. Courts will face an increase in complex litigation. Litigants will incur substantial transaction costs. The risk of erroneous court determinations will increase because tolerating such limited evidence as sufficient will undermine the accuracy of jury determinations. Franchisors will become overly cautious and circumspect that a single, good faith, erroneous decision (or even one that is in the realm of reasonable business judgment but that is second-guessed and found wanting by a jury) could lead to crushing liability. While at some threshold of wrongdoing antitrust remedies should supplement or supplant contract remedies, antitrust laws should not be available unless there are intended anticompetitive activities that involve sustained abuses of power in the market.

While futility can be demonstrated in certain circumstances without each individual plaintiff having applied for an alternate approved source, it should not excuse seeking to exercise express contract rights in the absence of a number of failed attempts by other franchisees to obtain approval. A franchisee who has not asserted his or her legal power under a contract for a second approved source does not have any contract remedies, because in the absence of a demand there can be no breach. In certain circumstances with clearer proofs of futility than exist in this case, such a franchisee should have an antitrust remedy without individually having to have sought to exercise their contract rights. Yet, short of a clearer showing of futility than exists here, such a franchisee should not have available antitrust remedies where he or she would have no contract remedy.

If antitrust law against tying arrangements is concerned with sustainable abuses of power restraining buyer choice, it is not too much to ask that before invoking antitrust remedies the plaintiff has sought to exercise the legal power readily available to attempt to counter the allegedly abusive power of the defendant. This is not to say that a plaintiff must file a breach of contract law suit before asserting an antitrust claim. But it is reasonable to ask a franchisee who has express contract rights to a second source to at least make a formal request under the franchise agreement if the franchisee cannot show with clear proof that such a request would be futile.

The reality is that a franchisor may through courage or uninformed folly deny one or two requests for a second source, but may relent, with or without legal advice, in the face of a number of second source requests. Each successive denial of a second source increases the franchisor's exposure to an antitrust remedy and each successive denial increases the likelihood that such a lawsuit may succeed. This reality may reverse minor abuses of power without resort to complex litigation. When the abuse of power is more unrelenting, then antitrust remedies are available with increased chances of success and lesser risks of harmful social costs. To require a higher standard of proof of futility than Fields and Hennessy have shown is not a license to franchisors to abuse their power under approved source contracts. Rather, a few more applications for an alternate source need only be tried which will either reverse the franchisor's reluctance to approve alternate sources or, alternatively,

build a sufficient claim of futility to get to a jury.

Plaintiffs in their brief in support of this motion cite the case of *Collins v. International Dairy Queen,* 939 F.Supp. 875 (M.D.Ga.1996), where in a class action franchise situation similar to the present case the district court found sufficient evidence of coercion to deny summary judgment. The court did not require a showing that each member of the class seek approval of an alternate source of goods needed to operate a Dairy Queen franchise.

. In *Collins,* the district court in finding sufficient evidence of coercion for the class members discussed assertions by the plaintiffs of various coercive actions by defendant Dairy Queen to frustrate the approval of alternate sources. Dairy Queen refused to recognize the Dairy Queen Operators' Cooperative ("DQOC") as the agent of the franchisees and "additionally refused to consider DQOC's requests for approval of alternate suppliers" thereby frustrating franchisees efforts "to obtain alternate sources of supply and more favorable prices." *Id.* at 881–882. DQOC was "a Minnesota corporation orga-nized as a purchasing cooperative for the benefit of Dairy Queen franchisees and store owners" *Id.* at 881 n3. If this occurred in the present case, the evidence of it is not clear from the present record.[7]

In addition there were multiple examples of Dairy Queen only giving summary specifications or making them available only for inspection and not for copying. Dairy Queen would change specifications or its logos after approved suppliers had invested in producing a product that complied with former specifications and had used the outdated logo. Additionally, there were examples of extreme delays in getting suppliers approved, some clearly unneeded because laboratory reports completed "several months" earlier confirmed the supplier met Dairy Queen's specifications. Dairy Queen approved warehouses refused at one time to stock an ice cream toping that had been used by its franchisees for years and met specifications where Dairy Queen had not approved the toppings because Dairy Queen would not approve the labels placed on its container. When these toppings were eventually allowed to be available to franchisees, the competition caused

---

7. At the October 16, 1997, hearing on this motion, *Collins v. International Dairy Queen, Inc.,* 168 F.R.D. 668 (M.D.Ga.1996), was discussed. It was noted that in *Collins* the franchisees' association, DQOC, had sought to act as a buying cooperative and in other ways act on behalf of the Dairy Queen franchisees. While it was not earlier asserted, plaintiffs' counsel in a November 5, 1997, letter brief to the Court noted that "The facts underlying this case are similar [to *Collins* ] in that plaintiff Smith also attempted to obtain alternate distributors *on behalf of a franchisee cooperative,* the A.L.C.F." (An Association for the Little Caesar Franchisee.) Unlike DQOC, it is not clear that A.L.C.F. is organized as a purchasing cooperative. Plaintiffs' counsel then asserts that a June 5, 1992, response from LCE's Vice Chairman Charles Jones to Gary Smith noted that Smith's request was written on A.L.C.F. stationary, but stated he "assumed that you were writing that letter in your capacity as a Little Caesar franchisee." This letter and other documents concerning Gary Smith's efforts to get AmeriServ approved as an alternate distributor are set out in the March 1998 Summary Judgment Report at and around p. 78. Plaintiffs' counsel claims that this indicates that "defendants flatly refused to recognize franchisees' efforts to purchase goods through a cooperative." Lockridge November 5, 1997, Letter the Court. Defense counsel responds that plaintiffs "now for the first time relies on a 1992 letter to establish a co-op request for a new distributor." Sussman November 7, 1997, Letter to the Court.

Plaintiffs are a little late in claiming that Gary Smith was acting on behalf of A.L.C.F. or all members of A.L.C.F. including Fields and Hennessy. It is also surprising that if A.L.C.F. was making the request that plaintiffs would not have some better proofs of Gary Smith's agency than the June 5, 1992, letter from LCE's Vice Chairman Charles Jones—possibly a declaration or affidavit, or a notation of an A.L.C.F. meeting. While AmeriServ made a presentation to all A.L.C.F. members at their convention in early 1993, this is consistent with the application for AmeriServ to be an alternative distributor being from Gary Smith representing his franchises only. It is also noteworthy that AmeriServ's memo notes that "until someone in the organizations take[s] a stand for their contract rights against the corporation, we will not be able to purchase/stock logo products." Turnbull October 16, 1995, Declaration, Ex. 19, noted in the March 1998 Summary Judgment Report at 79. This new assertion that Gary Smith was seeking approval of AmeriServ in his capacity as President of A.L.C.F. was not even listed among the "new evidence" that plaintiffs' counsel asserts warrants a reconsideration of this Court's denial of the tying claims of Fields and Hennessy. Nor is the association a plaintiff in this litigation.

Dairy Queen to reduce substantially its own toppings prices.

A review of *Collins* shows that the evidence of Dairy Queen's misuse of its approval process from which the *Collins* court determined that futility could be proved is more substantial than the evidence of similar abuses in the current record. Thus, while common proofs of futility are possible in a franchise antitrust case, in the present case, without Fields and Hennessy seeking approval of an alternate distributor, or being able to point to a sufficient number of other franchisees' failed efforts to obtain approval of an alternative distributor, or more substantial and convincing internal LCE/Blue Line documents, the single rejection of AmeriServ and the two Ilitch memos are not sufficient new evidence to warrant a modification of this Court's earlier grant of summary judgment.

## VI. RECOMMENDATION:

For the reasons noted above, IT IS RECOMMENDED THAT Plaintiffs' Motion Pursuant to Rule 54(b) be DENIED.

Any objections to this Report and Recommendation must be filed on or before May 11, 1998. 28 U.S.C. § 636(b)(1); E.D. Mich. LR 72.1(d)(2). Failure to file objections within the specified time constitutes waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Ivey v. Wilson,* 832 F.2d 950, 957–58 (6th Cir.1987); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

On or before June 1, 1998, the opposing party may file a response to any objecting party's timely filed objections. The response shall address specifically, and in the same order raised, each issue contained within the objections.

March 31, 1998.